**2020 IL 124992**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 124992)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
JUSTIN KNAPP, Appellant.

*Opinion filed December 3, 2020.*

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Justices Garman, Karmeier, and Theis concurred in the judgment and opinion.

Chief Justice Anne M. Burke dissented, with opinion, joined by Justice Neville.

Justice Neville dissented, with opinion.

Justice Michael J. Burke took no part in the decision.

**OPINION**

¶ 1        This appeal requires us to review the circuit court's summary dismissal of a petition seeking relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). The *pro se* petition alleged, in relevant part, that petitioner Justin Knapp did not voluntarily relinquish his right to testify at his trial. The appellate court affirmed. 2019 IL App (2d) 160162, ¶ 68.

¶ 2        In this court, petitioner argues that the appellate court erred in affirming summary dismissal of his postconviction petition because the court applied "too stringent of a standard" at the first stage of postconviction proceedings. Petitioner further argues that the appellate court misunderstood his right-to-testify claim when it found that his claim was positively rebutted by the record. For the following reasons, we affirm the appellate court's judgment.

¶ 3                                          I. BACKGROUND

¶ 4        Petitioner Justin Knapp and codefendant Luis Rodriguez were charged with attempted first degree murder, mob action, and aggravated battery in connection with the stabbing of petitioner's friend Jorge Avitia. The victim survived the attack and identified petitioner and Rodriguez as the assailants.

¶ 5                                       A. Trial Proceedings

¶ 6        At petitioner's jury trial in the circuit court of McHenry County, the State argued that petitioner and Rodriguez were members of the Norteños 14 street gang and that they attacked the victim based on his alleged association with a rival street gang, the Latin Kings.

¶ 7        The State's evidence showed that in the early morning hours of June 10, 2008, petitioner, the victim, and their mutual friend Andres Pedroza were at Pedroza's house in Crystal Lake. Pedroza, who was 19 years old, testified that he was friends with both petitioner and the victim since elementary school. At approximately 2:30 a.m., another friend, Christian Saenz, arrived at Pedroza's home with codefendant Rodriguez. The group of men left together in Saenz's car. After stopping briefly at

an apartment building, Saenz drove them to a residence located at 672 Brink Street in Woodstock. The group entered the home and sat together in the living room.

¶ 8        At some point, the victim and Rodriguez began to argue. Pedroza testified that he was sitting next to petitioner on the couch during the argument. Pedroza heard Rodriguez curse at the victim and call the victim a "King killer," a statement Pedroza understood as a reference to the Latin Kings street gang. Pedroza did not know whether petitioner was involved in the argument, but Pedroza did hear petitioner talking while Rodriguez and the victim argued. Pedroza could not hear what either petitioner or the victim said during the argument. Pedroza denied knowing whether petitioner was in a street gang but acknowledged that petitioner had tattoos on his face and arm that might be associated with the Norteños 14 gang.

¶ 9        As the argument continued, Pedroza told the victim "let's go," and they left the house together and walked toward a train station. After leaving the house, Pedroza realized that Rodriguez and petitioner were following them. Pedroza heard Rodriguez say "14 something." Petitioner was also talking, but Pedroza could not understand what he was saying. Eventually, Rodriguez and petitioner caught up to Pedroza and the victim. Pedroza saw petitioner and Rodriguez repeatedly hit the victim. Pedroza also saw either Rodriguez or petitioner holding a "shiny" object that Pedroza thought may have been a screwdriver, but Pedroza could not remember who was holding the object.

¶ 10        At some point, Pedroza intervened as the other two men attacked the victim. Pedroza grabbed petitioner and asked him what he was doing. After Rodriguez hit the victim one more time, both petitioner and Rodriguez ran away together. The victim fell to the ground and lost consciousness. Pedroza called 911.

¶ 11        On cross-examination, Pedroza conceded that he and petitioner consumed alcohol that night. Pedroza acknowledged that he was unaware of any prior fights between petitioner and the victim.

¶ 12        Several police and paramedics responded to Pedroza's 911 call, and they located the victim lying unconscious in a parking lot. Pedroza was also present and reported the details of the attack. Paramedics discovered that the victim sustained multiple stab wounds, including a puncture wound that was later revealed to have punctured his heart. After the victim was stabilized, medical personnel transported

him to a hospital, where he was treated for three stab wounds to his left collarbone, left armpit, and right lower abdomen.

¶ 13    Pedroza provided police officers with a description of Rodriguez and petitioner, including information that both men were wearing white shirts. Pedroza also told officers the direction that they ran after the attack.

¶ 14    Woodstock police officer Daniel Henry testified that, after he received a radio description of the assailants, he saw petitioner, who matched Pedroza's description, standing near the front door of 672 Brink Street. Petitioner was holding two red gas cans. Petitioner ran inside the residence when he saw Officer Henry's marked police car. Officer Henry knocked on the door, and he was let inside by the owner, James Kelley.

¶ 15    After entering the house, Officer Henry and his partner located petitioner lying on a couch under a blanket. Petitioner's white shirt and shoes were muddy, he was sweating, and he appeared out of breath. As the officers arrested petitioner, he became aggressive and started yelling references to the Norteños 14 gang. Petitioner also threatened to kill the officers and their families. The officers arrested petitioner and removed him from the residence.

¶ 16    When petitioner was brought outside, Pedroza, who was brought to the scene by another police officer, positively identified petitioner as one of the victim's attackers. Pedroza later identified Rodriguez as the second assailant in a photo array at the police station.

¶ 17    James Kelley testified that he lived with his girlfriend at 672 Brink Street, the residence where petitioner and Rodriguez reportedly argued with the victim. When Kelley arrived home the night of June 9, 2008, Rodriguez and another man were at his house. Kelley went to bed about 12:30 a.m. but was awakened in the early morning hours to the sounds of "banging" on his front door. Kelley saw petitioner "pacing" inside his house. Kelley did not recognize petitioner and did not know why petitioner was in his house. Petitioner asked Kelley not to open the door. Kelley ignored petitioner's request and told petitioner to sit down. Kelley testified that petitioner laid down on a couch and covered himself with a blanket.

¶ 18    Kelley opened the door to his residence and saw police officers standing outside. Kelley also saw two red gas cans outside his front door that he did not remember placing there. Kelley allowed the officers to enter his house and gave consent to their search of the house. After police officers entered, Kelley heard petitioner "freaking out on [the] couch[,] screaming things in Spanish, [and] threatening the police." Kelley described petitioner as "very aggressive" and heard him "yelling out some kind of gang thing about Nortenos."

¶ 19    On cross-examination, Kelley admitted that he was friends with Rodriguez and that on prior occasions he gave Rodriguez permission to "bring people to [Kelley's] house and party." Kelley denied that petitioner was ever at his house prior to the incident.

¶ 20    Kelley's girlfriend, Katrina Cardella, testified and generally corroborated Kelley's testimony. Cardella heard petitioner make several threats to police officers, their wives, and their children. Petitioner also threatened the lives of Kelley and Cardella. Cardella further testified that petitioner "kept yelling gang slogans about the 14s and how he was a gang banger and they never die."

¶ 21    The victim testified at trial, largely corroborating Pedroza's account of the events preceding the incident. Specifically, the victim confirmed that, prior to being attacked by petitioner and Rodriguez, he argued with them "about Nortenos and Kings." The victim knew petitioner was a member of the Norteños 14 street gang. The victim remembered being initially "attacked" by both petitioner and Rodriguez and that both men were "punching" his body. The next thing the victim remembered was waking up in a hospital.

¶ 22    On cross-examination, the victim denied being a member of a street gang. The victim conceded that he and petitioner never fought before and described petitioner as "basically" his best friend prior to the incident. The victim acknowledged that he and Pedroza were drinking alcohol prior to the incident. The victim confirmed that he did not see petitioner or Rodriguez holding a knife during the attack and he did not know who stabbed him.

¶ 23    The State introduced the testimony of two Crystal Lake police officers with experience in street gangs, Officer Paul Olazak and Officer Dimitri Boulahanis. Officer Olazak testified that petitioner admitted being a member of the Norteños 14

gang, a rival of the Latin Kings gang. Similarly, Officer Boulahanis testified that he was aware petitioner was a member of the Norteños 14 gang. Officer Boulahanis stated that petitioner had four gang tattoos, wore the colors of the Norteños 14 gang, and used hand gestures associated with that gang. Officer Boulahanis testified that he had observed the victim wearing the colors of the Latin Kings gang and socializing with known Latin Kings gang members, although the victim denied any membership in that gang.

¶ 24    The State introduced a knife that police officers recovered from the grass outside the residence at 672 Brink Street. When recovered, the knife had grass on it but no blood. No fingerprints were recovered from the knife. The parties stipulated that two suspected bloodstains on petitioner's watch and shoe could not be matched to the victim's DNA profile.

¶ 25    The defense offered certified statements of conviction to impeach two of the State's witnesses. Kelley had a conviction for theft by deception under $300, and the victim had a conviction for aggravated driving under the influence. After the court allowed the publication of those prior convictions to the jury, the defense rested.

¶ 26    Relevant to the issue in this appeal, during the jury instruction conference and before closing arguments, the State asked the trial court to admonish petitioner of his right to testify. The following exchange occurred:

"THE COURT: I will. Thank you, Miss Kelly. Sir, your attorney has just rested the defense case. Have you discussed with [defense counsel] your right to testify?

[PETITIONER]: Yes, ma'am.

THE COURT: Sir, is it your choice not to testify?

[PETITIONER]: Yes, ma'am.

THE COURT: You discussed that thoroughly with [defense counsel]?

[PETITIONER]: Yes.

THE COURT: You understand that the right to testify is a decision that you and you alone have the right to make but you should make that decision only after discussing it with your attorney. You have done that?

[PETITIONER]: Yes, ma'am.

THE COURT: It's your choice not to testify?

[PETITIONER]: Yes, ma'am.

THE COURT: Thank you.

[DEFENSE COUNSEL]: I have discussed it at great length with him and it's his decision and I respect it.

THE COURT: Okay. The record will so reflect. Thank you."

¶ 27 During closing arguments, the State argued that the undisputed evidence, including the victim's own testimony, showed that petitioner actively participated with Rodriguez in the attack on the victim. The State further argued that, even if petitioner did not stab the victim during the attack, petitioner was legally accountable for Rodriguez's conduct during the attack. In addition, the evidence demonstrated that the motive for the attack was a dispute over rival street gangs. Finally, the State maintained that petitioner's behavior after the attack was indicative of his guilt.

¶ 28 Defense counsel argued that the case depended on whether the jury believed that Pedroza and the victim truly knew whether petitioner was trying to help or hurt the victim during the incident. Counsel stressed that there was no forensic evidence connecting petitioner to the crime—no DNA, no fingerprints, no blood, and no photographs. Counsel further argued that the State's proposed gang-related motive for the attack did not make sense because the victim and petitioner were friends for years and were "well aware" of each other's respective gang connections prior to the incident. Ultimately, counsel asserted that the group was "drinking way too much and I don't think anyone knows what took place that night."

¶ 29 The jury returned guilty verdicts on all counts. The trial court entered judgment on the attempted murder conviction and sentenced petitioner to 16 years of imprisonment.

¶ 30    On direct appeal, petitioner argued that his counsel was ineffective because counsel "elicited inadmissible other crimes evidence that was similar to the charged offense and also false" and failed to "pursue a ruling on the State's motion to introduce gang evidence or renew his objection to the admission of such evidence." The appellate court rejected both claims and affirmed the trial court's judgment in a summary order. *People v. Knapp*, No. 2-09-0089 (2010) (unpublished summary order pursuant to Illinois Supreme Court Rule 23(c)).

¶ 31                        B. Postconviction Proceedings

¶ 32    On November 19, 2015, petitioner filed a *pro se* postconviction petition that is the subject of the instant appeal. In that petition, petitioner raised claims of actual innocence, involuntary waiver of his right to testify, and ineffective assistance of appellate counsel. Petitioner attached his affidavit and more than 80 pages of supporting exhibits, including various documents and transcripts related to his criminal case and the associated police investigation.

¶ 33    Relevant to this appeal, petitioner argued that the "waiver of his right to testify at trial was not knowing and/or [*sic*] voluntary where defense counsel failed to inform petitioner that counsel was in possession of police reports and other evidence corroborative of petitioner's version of the relevant events." According to petitioner, he had several conversations with defense counsel about his right to testify. Petitioner told his counsel that the argument with the victim was not about gangs but instead was over a girl named Jackie Gutierrez that Rodriguez had insulted. Petitioner also claimed that he met Rodriguez only once before that night and he did not know Rodriguez was in a gang. Petitioner told his counsel that he saw blood on Rodriguez's pants and that petitioner moved the two gas cans after Rodriguez attempted to burn a bloody shirt. In response, petitioner's counsel told petitioner that this proposed testimony was not supported by independent evidence and that petitioner's denial of Rodriguez's gang affiliation would open the door for the State's gang expert to testify.

¶ 34    In petitioner's attached affidavit, he averred that the answers he gave during the colloquy with the court on his right to testify were "the direct result and proximate cause of my attorney's representations to me that there must be corroborative evidence supporting my testimony." Petitioner denied that he was ever told by his

counsel or the court that he had an "absolute right to testify and the decision was mine alone to make." Lastly, petitioner attested that "[a]t no time was I made aware by my attorney that he in fact possessed physical and circumstantial evidence tending to support my intended testimony. Had I known such evidence existed, or that my right to testify was not contingent on any extrinsic evidence, I never would have waived my right to testify at trial."

¶ 35    In January 2016, the circuit court summarily dismissed the petition, concluding that petitioner's claims were frivolous and patently without merit. Petitioner appealed, challenging only the trial court's determination that petitioner's right-to-testify claim was frivolous and patently without merit. The appellate court affirmed summary dismissal, concluding that the record positively rebutted petitioner's claim. Alternatively, even if petitioner alleged the gist of a claim of constitutionally deficient performance from trial counsel, the court reasoned that petitioner's claim still failed because petitioner did not sufficiently allege prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). 2019 IL App (2d) 160162, ¶¶ 1, 38, 42.

¶ 36    The dissenting justice argued that the majority erroneously applied heightened postconviction standards to the trial court's first-stage summary dismissal of the petition and misconstrued petitioner's claim on his right to testify. The dissent argued that the record did not positively rebut petitioner's claim because petitioner relied on off-the-record conversations with counsel. 2019 IL App (2d) 160162 ¶¶ 70-134 (McLaren, J., dissenting).

¶ 37    Petitioner filed a petition for leave to appeal pursuant to Illinois Supreme Court Rules 315 (eff. July 1, 2018) and 612 (July 1, 2017). We allowed his petition.

¶ 38                                II. ANALYSIS

¶ 39    On appeal, petitioner argues that the appellate court erred in affirming the circuit court's summary dismissal of his postconviction petition because it erroneously applied "too stringent of a standard" and misunderstood the nature of his right-to-testify claim by concluding that the claim was rebutted by the record. We review *de novo* a circuit court's dismissal of a postconviction petition. *People v. Allen*, 2015 IL 113135, ¶ 19.

¶ 40    We first address petitioner's contention that the appellate court applied "too stringent" of a standard to his petition. Specifically, petitioner argues that the appellate court erroneously relied on two decisions that involved a second-stage dismissal in its analysis of his claims, thereby showing that his petition "was unfairly held to second-stage postconviction standards despite being dismissed at the first stage." Petitioner asks this court to reaffirm our prior precedent, particularly our decision in *People v. Hodges*, 234 Ill. 2d 1 (2009), holding that at the first stage of postconviction proceedings, the pleadings should be liberally construed and the threshold for advancing to the second stage is low.

¶ 41    As petitioner notes, the appellate court majority cited two decisions involving the second-stage dismissal of a postconviction petition for general standards applicable to ineffective assistance of counsel claims. See 2019 IL App (2d) 160162, ¶ 38 (citing *People v. Domagala*, 2013 IL 113688, ¶ 36, and *People v. Coleman*, 183 Ill. 2d 366, 397 (1998)). We observe, however, that the appellate court majority's analysis also cited several applicable first-stage decisions, including our decision in *Hodges*. 2019 IL App (2d) 160162, ¶¶ 36-37.

¶ 42    The appellate court majority's citation to two second-stage decisions does not affect our analysis. As we have already observed, this court reviews *de novo* the circuit court's summary dismissal of a postconviction petition. *Allen*, 2015 IL 113135, ¶ 19. We now consider the petitioner's arguments on the substantive issue in this case—whether the circuit court erred in determining that petitioner's allegation on his right to testify was frivolous and patently without merit.

¶ 43    The Post-Conviction Hearing Act provides a three-stage procedural mechanism for a criminal defendant to challenge his or her conviction or sentence for violations of federal or state constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2014); *People v. Hommerson*, 2014 IL 115638, ¶ 7. At the first stage, within 90 days after the petition is filed and docketed, a circuit court shall dismiss a petition summarily if the court determines it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2014); *Allen*, 2015 IL 113135, ¶ 21.

¶ 44    Because most postconviction petitions are drafted by *pro se* petitioners, the threshold for a petition to survive the first stage of review is low. *Hodges*, 234 Ill. 2d at 9. Consequently, summary dismissal of a postconviction petition is warranted in a limited number of situations. *Allen*, 2015 IL 113135, ¶ 25.

¶ 45 Generally, a petition may be summarily dismissed as frivolous or patently without merit at the first stage only " 'if the petition has no arguable basis either in law or in fact' " or when the petition relies on " 'an indisputably meritless legal theory or a fanciful factual allegation.' " *Allen*, 2015 IL 113135, ¶ 25 (quoting *Hodges*, 234 Ill. 2d at 16-17). For purposes of summary dismissal, a meritless legal theory is one completely contradicted by the record, while fanciful factual allegations may be " 'fantastic or delusional.' " *Allen*, 2015 IL 113135, ¶ 25 (quoting *Hodges*, 234 Ill. 2d at 17).

¶ 46 A postconviction petition alleging ineffective assistance of counsel should not be summarily dismissed if (1) it is arguable that counsel's performance fell below an objective standard of reasonableness and (2) it is arguable that the petitioner was prejudiced. *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Hodges*, 234 Ill. 2d at 17). Relevant here, it is settled that the decision whether to testify in one's own defense during a criminal trial is a fundamental constitutional right that belongs solely to the defendant. *People v. Medina*, 221 Ill. 2d 394, 403 (2006); *People v. Enis*, 194 Ill. 2d 361, 399 (2000); *People v. Madej*, 177 Ill. 2d 116, 145-46 (1997). The decision, however, should be made with the advice of counsel. *People v. Smith*, 176 Ill. 2d 217, 235 (1997). To preserve the right to testify, a criminal defendant is required to make a "contemporaneous assertion" of that right. *Enis*, 194 Ill. 2d at 399; *Smith*, 176 Ill. 2d at 236; *People v. Thompkins*, 161 Ill. 2d 148, 177-78 (1994); *People v. Brown*, 54 Ill. 2d 21, 24 (1973).

¶ 47 Petitioner maintains that his postconviction petition was sufficient to survive summary dismissal because it "presented the gist of a constitutional claim that defense counsel was ineffective for providing bad advice" on his right to testify. Petitioner contends that it is arguable his counsel's performance fell below an objective standard of reasonableness because counsel incorrectly told petitioner that he could not testify unless there was corroborating evidence to support his testimony. Similarly, petitioner asserts that it was arguable he was prejudiced by counsel's bad advice because his proposed testimony arguably would have attacked the credibility of the victim and Pedroza and the State's theory of the gang-related motive for the attack.

¶ 48 Petitioner asserts that his failure to make a contemporaneous assertion of his right to testify does not defeat his claim at the first stage of postconviction

proceedings. According to petitioner, because the petition alleged that he had several off-the-record conversations with his counsel, "it can be inferred that he did indeed make a contemporaneous assertion to counsel, even if he did not have the legal knowledge to explicitly phrase it as such in his postconviction petition."

¶ 49    The State responds that summary dismissal was appropriate because petitioner failed to present the gist of a claim that counsel violated his right to testify when petitioner failed to make a contemporaneous assertion of his right to testify. The State also argues that the trial court asked petitioner on the record about his decision to relinquish his right to testify and petitioner affirmed that he chose not to testify, positively rebutting the claims in his petition. Alternatively, the State contends that petitioner failed to allege sufficiently that trial counsel's performance was arguably deficient. In addition, the State asserts that petitioner failed to show that any deficiency of counsel arguably prejudiced petitioner when the evidence of his guilt was overwhelming and his proposed testimony did nothing more than provide an alternative motive for the attack.

¶ 50    Because we find it dispositive, we first address whether the record rebuts petitioner's allegations on his right to testify. We agree with petitioner's general proposition that a *pro se* petitioner is not required to use precise legal language alleging a "contemporaneous assertion of the right to testify" to survive first-stage summary dismissal. Our postconviction jurisprudence, however, holds that summary dismissal is warranted when the record positively rebuts the allegations. *Allen*, 2015 IL 113135, ¶ 25 (citing *Hodges*, 234 Ill. 2d at 17).

¶ 51    Here, the record contains nothing to suggest that petitioner ever alerted the trial court of his desire to testify, that he had any questions about his right to testify, or that he otherwise was unsure about waiving his right to testify. See *Smith*, 176 Ill. 2d at 234 (observing that "a vast majority of the states considering this question have held that a defendant's waiver of his right to testify is presumed if *** he fails to testify or notify the court of his desire to do so"). Petitioner did not express any indication that he wanted to testify when the circuit court admonished him of that right at the request of the State prior to closing arguments.

¶ 52    Petitioner acknowledges that the trial court admonished him on the record of his right to testify. Petitioner asserts, however, that those admonishments do not rebut his postconviction claim that trial counsel's incorrect advice rendered

petitioner's decision not to testify involuntary. Similar to the dissenting justice's position, petitioner argues that "[j]ust because [his] off-record claims were not supported by on-record evidence does not mean that they were rebutted" for purposes of postconviction proceedings. We disagree.

¶ 53　　Critically, the record demonstrates that petitioner not only understood his right to testify but that it was petitioner's decision not to testify. See *Enis*, 194 Ill. 2d at 399 ("The decision whether to take the witness stand and testify in one's own behalf ultimately belongs to the defendant." (citing *Thompkins*, 161 Ill. 2d at 177)). The circuit court admonished petitioner that "the right to testify is a decision that you and you alone have the right to make but you should make that decision only after discussing it with your attorney." Petitioner immediately confirmed that it was his decision not to testify. Trial counsel also confirmed on the record that he discussed the matter "at great length" with petitioner and that petitioner made the decision not to testify.

¶ 54　　Even taking petitioner's allegations as true and construing them liberally (*Allen*, 2015 IL 113135, ¶ 25), the alleged off-the-record conversations with counsel on petitioner's right to testify occurred before the circuit court's admonishments. After the court's admonishments, petitioner confirmed on the record that the decision not to testify was his alone. See, *e.g.*, *People v. Cleveland*, 2012 IL App (1st) 101631, ¶ 65 (explaining that, "[a]s with many constitutional rights that may be waived, it is incumbent upon the defendant to assert his right to testify such that his right can be vindicated during the course of the trial"). Nothing in our postconviction jurisprudence allows, let alone requires, a reviewing court to ignore the record. In our view, petitioner's responses during the trial court's admonishments unequivocally rebut his allegations that his decision not to testify was involuntary or based on allegedly erroneous advice from counsel.

¶ 55　　We acknowledge, as petitioner directs to our attention, that the Seventh Circuit Court of Appeals has commented on the appellate court decision in this case. Specifically, in a footnote the Seventh Circuit stated that

"we are troubled by the obligation that Illinois caselaw appears to impose upon a defendant to contemporaneously assert a right to testify in circumstances where defense counsel has just silenced the defendant. Perhaps the Illinois Supreme Court will find occasion to take another look at its approach when it

considers *Knapp* later this term." *Hartsfield v. Dorethy*, 949 F.3d 307, 315 n.5. (7th Cir. 2020).

¶ 56    Respectfully, we find those concerns inapplicable here. In *Hartsfield*, Hartsfield and his mother both alleged that Hartsfield communicated his desire to testify and *counsel disagreed and said he would not put Hartsfield on the stand*. Counsel assured Hartsfield that he would get his chance to speak when the trial judge admonished him on the right to testify, *but the trial court never gave Hartsfield any admonishments on his right to testify*. Later, when Hartsfield attempted to assert his right to testify on the record and in open court, he claimed that *counsel " 'shushed' " him* and prevented Hartsfield from expressing his desire to testify. (Emphasis added.) *Hartsfield*, 949 F.3d at 315. None of those circumstances are present here.

¶ 57    It is worth noting that *Hartsfield* recognized there is not settled United States Supreme Court precedent on the preservation of a defendant's right to testify at his or her criminal trial. *Hartsfield*, 949 F.3d at 316. In fact, the Seventh Circuit cited favorably the First Circuit's determination that " 'the [United States] Supreme Court has never articulated the standard for assessing whether a criminal defendant has validly waived his right to testify or determined who has the burden of production and proof under particular circumstances.' " *Hartsfield*, 949 F.2d at 316 (quoting *Jenkins v. Bergeron*, 824 F.3d 148, 153 (1st Cir. 2016)). Necessarily, then, we adhere to settled Illinois law on the matter.

¶ 58    In summary, the record in this case contains not even the slightest suggestion that petitioner was hesitant or unsure of his decision not to testify or otherwise wished to exercise his right to testify. Instead, the record demonstrates that the trial court confirmed that petitioner consulted with counsel on his decision whether to testify, petitioner understood that the decision whether to testify was his alone, and then petitioner chose not to testify. On this record, we agree with the appellate court that summary dismissal was warranted because petitioner's postconviction allegations are positively rebutted by the record and, therefore, without merit. *Allen*, 2015 IL 113135, ¶ 25 (citing *Hodges*, 234 Ill. 2d at 17).

¶ 59                                  III. CONCLUSION

¶ 60    For the reasons stated, we conclude that the circuit court did not err in summarily dismissing petitioner's postconviction petition. We therefore affirm the appellate court's judgment that reached the same conclusion.

¶ 61    Affirmed.

¶ 62    CHIEF JUSTICE ANNE M. BURKE, dissenting:

¶ 63    A majority of this court affirms the appellate court judgment, which affirmed the circuit court's summary dismissal of the *pro se* postconviction petition brought by petitioner, Justin Knapp. In reaching this result, the majority fundamentally misinterprets petitioner's postconviction claim. Accordingly, I respectfully dissent.

¶ 64    Petitioner filed a *pro se* postconviction petition, alleging that he did not voluntarily relinquish his right to testify at his trial. In support, petitioner provided an affidavit in which he asserted that counsel misled him by misstating the law, *i.e.*, telling him that he could not testify if he did not have extrinsic evidence supporting his proposed testimony. In addition, petitioner averred in his affidavit that counsel failed to tell him that certain evidence existed that would have supported petitioner's proposed testimony, thus making counsel's advice both legally and factually inaccurate. The circuit court summarily dismissed the petition, and the appellate court affirmed, with Justice McLaren dissenting. 2019 IL App (2d) 160162, ¶ 68.

¶ 65    A majority of this court affirms. The majority holds that summary dismissal was warranted because the record positively rebuts petitioner's allegations. The majority states, "the record contains nothing to suggest that petitioner ever alerted the trial court of his desire to testify, that he had any questions about his right to testify, or that he otherwise was unsure about waiving his right to testify." *Supra* ¶ 51.

¶ 66    According to petitioner's postconviction petition, the reason petitioner told the trial court that he had no questions about his right to testify is because his attorney gave him bad advice. To merely state that petitioner said he had no questions about testifying—which is all the majority does here—is to completely miss the point of

- 15 -

petitioner's contention. Stated otherwise, the majority has concluded that, no matter how inaccurate or ill-informed an attorney's advice may be, it can have no effect on the voluntariness of a defendant's decision to testify, so long as the defendant tells the trial court that he has no questions about testifying. I do not think this is a reasonable result.

¶ 67        In a lengthy and thorough dissent in the appellate court Justice McLaren explained why the analysis adopted by the majority here is flawed. Because petitioner's postconviction petition was dismissed at the first stage, his petition only needed to present the gist of a constitutional claim, which is a low threshold, " 'requiring only that the petitioner plead sufficient facts to assert an arguably constitutional claim.' *People v. Brown*, 236 Ill. 2d 175, 184 (2010)." 2019 IL App (2d) 160162 ¶ 73 (McLaren, J., dissenting). Noting that "[i]ncomplete or inaccurate information given to a defendant regarding his right to testify ' "is arguably a factor in consideration of whether counsel was ineffective." ' *Id.* ¶ 91 (quoting *People v. Lester*, 261 Ill. App. 3d 1075, 1079 (1994), quoting *People v. Nix*, 150 Ill. App. 3d 48, 51 (1986))," the dissent concluded that "petitioner pled sufficient facts to assert an arguably constitutional claim (see *Brown*, 236 Ill. 2d at 184) such that the petition was neither frivolous nor [patently] without merit." *Id.* I agree with the analysis and conclusions reached in Justice McLaren's dissent and adopt it in its entirety. Accordingly, I would hold that the trial court's dismissal should be reversed and the cause remanded for second-stage proceedings.

¶ 68        JUSTICE NEVILLE joins in this dissent.


¶ 69        JUSTICE NEVILLE, dissenting:

¶ 70        I join in Chief Justice Burke's dissent and agree that Justice McLaren's dissent correctly analyzes and resolves the first-stage postconviction question presented in this case. I write separately to restate and highlight the well-settled rule that at the first stage of postconviction proceedings, a pleading review stage, the trial court is limited to examining the pleadings to determine whether the allegations in the petition allege a constitutional infirmity or denial of rights that would necessitate relief under the Act. See *People v. Robinson*, 2020 IL 123849, ¶¶ 42, 45; see also *People v. Allen*, 2015 IL 113135, ¶ 24; *People v. Brown*, 236 Ill. 2d 175, 184 (2010); *People v. Collins*, 202 Ill. 2d 59, 65-66 (2002). As explained in *Robinson*,

at the pleading stage the trial court is precluded from making factual and credibility determinations. *Robinson*, 2020 IL 123849, ¶ 45. Therefore, at the first stage of postconviction proceedings, the trial court cannot consider the merits of substantive issues raised in the petition. *Id.* Accordingly, I join in this dissent because the majority ignored the first-stage postconviction procedural rules delineated in Illinois Supreme Court jurisprudence.

¶ 71       JUSTICE MICHAEL J. BURKE took no part in the consideration or decision of this case.