2023 IL App (1st) 210583-U

No. 1-21-0583

Order Filed February 24, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 09 CR 11653 |
| | ) | |
| IAN VALENCIA | ) | Honorable James M. Obbish, |
| | ) | Judge Presiding. |
| Petitioner-Appellant. | ) | |

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Delort and Justice Mitchell concurred in the judgment.

**ORDER**

*Held:* Trial court properly granted the State's motion to dismiss petitioner's second-stage postconviction petition where petitioner failed to make a substantial showing that: (1) he was actually innocent of attempted first degree murder; (2) he was deprived of effective assistance of counsel; and (3) his sentence was unconstitutional as applied to him.

¶ 1    Petitioner, Ian Valencia, appeals from the trial court's grant of the State's motion to dismiss his second-stage postconviction petition. On appeal, Valencia contends that he made a substantial showing that: (1) he was actually innocent of attempted first degree murder where he presented newly discovered evidence; (2) he was deprived of effective assistance of trial counsel

where counsel advised him not to testify; and (3) the mandatory sentencing scheme that led to his 26-year sentence is unconstitutional as applied to him. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Following a bench trial, Valencia was found guilty of two counts of attempted first degree murder and one count of aggravated discharge of a firearm stemming from an incident that occurred on June 11, 2009. The details of the trial were discussed on direct appeal in *People v. Valencia*, 2012 IL App (1st) 102312-U, but we will reiterate them here as necessary to this appeal.

¶ 4      Nelson Villagomez testified that on the date in question, at approximately 4:45 p.m., he and his brother, Freddie Villagomez, began walking home from the bus stop located near their apartment at 4130 North Kimball. *Id*. ¶ 3. As they walked northbound on Kimball, Nelson noticed a gray Oldsmobile with a man, later identified as Walter Quevedo, in the driver's seat. *Id*. The car pulled up alongside Nelson and Freddie. *Id*.

¶ 5      According to Nelson, Valencia, who was in the passenger seat, "started gang banging" to Nelson and Freddie, and "threw up a gang sign." *Id*. ¶ 4. In response, Nelson told him that he was not "gang banging." *Id*. The encounter lasted approximately 20 seconds. *Id*. Nelson and Freddie were not carrying any weapons and did not make any motions towards the car. *Id*. Nelson had no connection to a gang. *Id*.

¶ 6      Freddie walked ahead of Nelson as they crossed the street. *Id*. ¶ 5. He was a couple steps from their front door when Nelson observed the Oldsmobile parked in an alley, about half a block from his home. *Id*. With both arms raised and his palms up, Nelson said to Valencia, "What you want to do?" *Id*. Nelson then observed Valencia's hand come out of the passenger

2

window, saw flames from a gun, and heard approximately six gunshots. *Id.* Valencia was shooting in Nelson's direction. *Id.*

¶ 7    When the shooting stopped, Nelson got up from the ground, checked to make sure his brother was safe, and then called the police to report the shooting. *Id.* ¶ 6. The police arrived within a few minutes and took Nelson and Freddie to the police station, where Valencia and Quevedo were in police custody. *Id.* Nelson and Freddie positively identified Valencia as the passenger and the shooter, and Quevedo as the driver. *Id.*

¶ 8    Freddie Villagomez's testimony was substantially the same as that of Nelson's. *Id.* ¶¶ 7-8. Officer John Becker testified that a search of the Oldsmobile revealed a semiautomatic .380-caliber Kel-Tec handgun and two .380 caliber bullets in a hidden compartment under the glove compartment on the passenger side. *Id.* ¶ 9.

¶ 9    Officer Becker testified that he spoke with Valencia on the night of the shooting, and that Valencia said Quevedo told him there was a gun underneath the dashboard on the passenger side, so Valencia retrieved the gun and shot at Nelson and Freddie until the gun was empty. *Id.*

¶ 10    Amy Campbell, an evidence technician, testified that she found five expended shell casings at the mouth of the alley. *Id.* ¶ 10. She also recovered a fired bullet lodged in the front siding, beneath the second-floor window of the home next door to Nelson and Freddie's apartment building. *Id.* She recovered a fired bullet from the flowerbed located in front of the brothers' apartment building. *Id.*

¶ 11    At the conclusion of Valencia's bench trial, he was sentenced to 6 years' imprisonment for attempted murder, enhanced by a 20-year term for personally discharging a firearm during the commission of the offense. On direct appeal, Valencia argued that the State failed to prove

him guilty of attempted murder beyond a reasonable doubt. This court disagreed and affirmed the trial court's judgment. *People v. Valencia*, 2012 IL App (1st) 102312-U.

¶ 12    On July 12, 2013, Valencia filed a *pro se* postconviction petition raising the following arguments: 1) he was actually innocent of attempted first degree murder; 2) trial counsel was ineffective for telling Valencia that his juvenile adjudications were admissible against him, which caused him to give up his right to testify at trial; 3) trial counsel was ineffective for failing to interview a witness; 4) trial counsel was ineffective for telling defendant to reject the State's plea offer of nine years' imprisonment in exchange for a guilty plea to one count of Class 1 aggravated discharge of a firearm; and 5) the 20-year mandatory firearm enhancement violated the United States and Illinois constitutions as applied to 17-year-olds.

¶ 13    Valencia supported his petition with numerous affidavits. In support of his actual innocence claim, he attached the affidavit of James Galambos, whom Valencia met while they were both incarcerated at Stateville Correctional Center. Galambos stated in his affidavit that he witnessed the shooting and that he "saw the gun pointed upward at an angle, not towards the man that was yelling."

¶ 14    On September 27, 2013, in a 28-page written order, the trial court summarily dismissed Valencia's *pro se* postconviction petition. Valencia appealed.

¶ 15    On appeal, Valencia contended that his postconviction petition was improperly dismissed because it raised arguable claims of: 1) actual innocence; 2) ineffective assistance of counsel; and 3) unconstitutional sentencing. *People v. Valencia*, 2016 IL App (1st) 133524-U. We found that the trial court was misplaced in relying on two cases, *People v. Brown*, 54 Ill. 2d 21, 24 (1973) and *People v. Thompson*, 161 Ill. 2d 148, 177-78 (1994)), in dismissing Valencia's petition because both cases discussed the dismissal of second-stage petitions, not first-stage

4

petitions. *Valencia*, 2016 IL App (1st) 133524-U, ¶ 28. We noted that Valencia's petition was merely at the first stage of postconviction proceedings, "where the threshold for survival is low." *Id*. ¶ 28.

¶ 16    Based on our determination that the trial court applied an incorrect standard when reviewing Valencia's petition, we then looked at the petition with the correct standard and found that there was nothing in the record to affirmatively rebut Valencia's claim that his attorney told him that if he testified, the shooting he took part in as a juvenile would be used against him by the State. *Id*. ¶ 31. Accordingly, we found that it was arguable that counsel's advice misled Valencia into thinking that, no matter what, his juvenile adjudication would be used against him if he testified. *Id*. ¶¶ 29-30. Accordingly, because we found that Valencia's petition adequately set forth allegations that showed his counsel's performance arguably fell below an objective standard of reasonableness and that he was arguably prejudiced, we reversed and remanded with directions to advance Valencia's petition to the second stage. *Id*. ¶ 31. In doing so, we stated:

> "We do not, by our ruling, suggest that defendant's argument will ultimately prevail. Rather, we are following long established legal precedent regarding the procedural process which must be applied to a postconviction petition. In the instant case, the record suggests the trial judge either conflated the first and second stages, or he went directly to the second stage when ruling on defendant's petition. We voice no opinion on the ultimate ruling which will result from allowing defendant's petition to advance in the proper procedural sequence." *Id*. ¶ 33.

¶ 17    On remand, appointed counsel filed a supplemental postconviction petition. The petition added the following claims: (1) Valencia's 26-year sentence is unconstitutional due to his age in

light of *Miller v. Alabama*, 567 U.S. 460 (2012); (2) the non-retroactive application of section 5-4.5-105 denies equal protections to juvenile defendants sentenced before the statute's effective date; and (3) that the exclusive jurisdiction of the juvenile courts is unconstitutional. Counsel filed a motion to withdraw Valencia's claims that his trial counsel was ineffective for failing to call Quevedo as a witness and for advice regarding plea negotiations.

¶ 18    On August 4, 2020, the State filed a motion to dismiss. A hearing was held, after which a written order was issued by the trial court. The trial court stated that the court had admonished Valencia of his right to testify, that the decision to testify was his alone to make, and that Valencia never alerted the court of his desire to testify. The trial court noted that even taking Valencia's allegations as true, his alleged off-the-record conversation with counsel occurred before the court's admonishments. Therefore, Valencia's allegations of prejudice were affirmatively rebutted by the trial court record.

¶ 19    The trial court rejected Valencia's claim of actual innocence based on the affidavit of Galambos, a fellow inmate of Valencia's. The trial court noted that Valencia and Galambos had "allegedly never met before they were imprisoned together." The trial court found that Valencia failed to carry his burden where bullets fired from his gun landed in the flowerbed of the victim's house and in a nearby wall. Absent ballistics evidence of his own, the court found that Valencia failed to make a substantial showing of a constitutional violation.

¶ 20    In terms of the constitutionality of Valencia's sentence, the court noted that the sentence was not a *de facto* life sentence. The trial court then stated that a 26-year aggregate sentence for shooting at two "defenseless brothers," even at the age of 17, "does not shock the moral sense of the community." The court found Valencia failed to make a substantial showing that his 20-year firearm enhancement violates the proportionate penalties clause as applied to him.

¶ 21    Valencia now appeals.

¶ 22                              II. ANALYSIS

¶ 23    On appeal, Valencia contends that that he made a substantial showing in his second-stage postconviction petition that: (1) he is actually innocent of attempted first degree murder; (2) he was denied effective assistance of counsel which resulted in his denial of his right to testify; and (3) his sentence is unconstitutional. The State responds that Valencia's supporting evidence is insufficient to demonstrate a substantial showing of actual innocence, the record rebuts his contention that he was denied effective assistance of counsel or the right to testify, and Valencia failed to make a substantial showing that his 26-year sentence is unconstitutional as applied to him.

¶ 24    Under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2020)), individuals convicted of criminal offenses may challenge their convictions on grounds of constitutional violations. The Act sets forth three stages of review. To survive dismissal at the initial state of a postconviction proceeding, a petition need only present the gist of a meritorious constitutional claim, requiring only that the petitioner plead sufficient facts to assert an "arguably constitutional claim." *People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 25    At the second stage, "the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). The petitioner bears the burden of making this substantial showing. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or show a constitutional violation. *Id*. The "substantial showing" of a constitutional violation "is a measure of the legal sufficiency of the petition's

7

well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original). *People v. Domagala*, 2013 IL 113688, ¶ 35.

¶ 26                                    A. Actual Innocence

¶ 27     Valencia first contends that he made a substantial showing of actual innocence in his second-stage postconviction petition. To establish a claim of actual innocence, a petitioner must present evidence that is: (1) newly discovered, meaning the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence; (2) material and not cumulative, meaning the evidence is relevant and probative of the petitioner's actual innocence and adds to the information the trier of fact heard at trial; and (3) be of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47.

¶ 28     In support of Valencia's claim that he made a substantial showing in his second-stage postconviction petition of his actual innocence, he attached the affidavit of Galambos, whom he met at Stateville while serving his sentence in this case. Galambos stated in his affidavit that he witnessed the shooting and was standing right by the car when he saw the shooter point the gun "upward at an angle, not toward the man yelling." Galambos averred that he left the scene immediately after the shooting because he did not want to be in the area if anything else happened. After Valencia told him about the offense, Galambos realized that he had witnessed the shooting and shared what he had seen. Valencia contends that this newly discovered evidence was not positively rebutted by the record and negates the finding that Valencia acted with the requisite intent to kill.

¶ 29 The State concedes that Galambos' affidavit is considered newly discovered evidence, as it could not have been discovered prior to Galambos and Valencia meeting at Stateville. It also concedes that the evidence is material and noncumulative because it is relevant to Valencia's actual innocence. However, it maintains that the result of the trial would not have changed if this evidence had been presented since the other trial evidence presented at trial refuted the testimony in the affidavit. We agree.

¶ 30 The evidence presented at trial showed that on June 11, 2009, Valencia initiated an argument with two brothers. When one of the brothers yelled, "What you going to do?" Valencia pointed a firearm at him and fired five or six shots. According to one of the brothers, Valencia shot directly at him. Upon being arrested, Valencia admitted to police that he had shot "at the two victims until the gun was empty."

¶ 31 At the time of the shooting, one of the brothers was standing in front of his house with his back to his neighbor's house. Fired bullets were found in the flowerbed in front of the brothers' home and embedded into the siding of the neighbor's house. This physical evidence corroborated the brothers' testimony that Valencia fired *at* the brothers.

¶ 32 To accept Galambos' affidavit as true, we would have to ignore the physical evidence presented at trial, and infer, as the trial court noted, that a "bullet naturally fell from the sky so close to the victims," and another bullet "fired upward embedded itself in a wall behind the victim." Accordingly, because Galambos' affidavit is positively rebutted by the record and is not of such conclusive character that it would probably change the result on retrial, we find that Valencia failed to make a substantial showing of actual innocence in his second-stage postconviction petition. *Robinson*, 2020 IL 123849, ¶ 47; *People v. Sanders*, 2016 IL 118123, ¶¶ 48, 52-53 ("Well-pleaded factual allegations of a postconviction petition and its supporting

evidence must be taken as true unless they are positively rebutted by the record of the original trial proceedings.")

¶ 33                    B. Ineffective Assistance of Counsel

¶ 34    Valencia's next argument on appeal is that he made a substantial showing in his second-stage postconviction petition that he received ineffective assistance of counsel where trial counsel advised him not to testify because of his juvenile adjudication. The State responds that the court advised Valencia of his right to testify and ensured that his waiver of that right was knowing and voluntary, and therefore there was no ineffective assistance of counsel.

¶ 35    Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

¶ 36    Every criminal defendant has the fundamental constitutional right to decide whether to testify at trial. *People v. Knapp*, 2020 IL 124992, ¶ 46. Although an attorney may advise his or her client on the potential consequences of testifying, the ultimate decision whether to exercise that right belongs only to the defendant, and only the defendant may waive the right to testify. *Id*. Generally, an attorney's performance will not be found ineffective simply because counsel

advised the defendant not to testify; rather, counsel will only be found to be ineffective where the "evidence suggested that counsel refused to allow the defendant to testify." *People v. Youngblood*, 389 Ill. App. 3d 209, 217 (2009).

¶ 37    In *Knapp*, which was issued by our supreme court while this case was pending in the trial court after being remanded to second-stage proceedings, the defendant claimed in a postconviction petition that he unknowingly and involuntarily waived his right to testify due to trial counsel's erroneous advice. *Knapp*, 2020 IL 124992, ¶ 33. The defendant alleged that his counsel told him that his testimony was not supported by independent evidence and that the defendant's denial of gang affiliation would open the door for the State's gang expert to testify. *Id*. The defendant averred in his affidavit that he would not have waived his right to testify at trial if he had known that his right to testify was not contingent on extrinsic evidence. *Id*. ¶ 34.

¶ 38    In *Knapp*, after the circuit court admonished the defendant of his right to testify, the defendant advised the court that he understood the decision to testify was his and his alone. *Id*. ¶ 26. The circuit court ultimately dismissed the petition at the first stage, the appellate court affirmed, and the supreme court affirmed the appellate court's judgment. *Id*. ¶¶ 2, 35. The supreme court explained that, because the circuit court informed the defendant that he had a right to testify, and the defendant affirmed that he did not want to testify at trial after counsel's allegedly deficient conduct, the record positively rebutted the defendant's ineffective assistance claim. *Id*. ¶¶ 51-54, 58.

¶ 39    In doing so, our supreme court stated, "[t]o preserve the right to testify, a criminal defendant is required to make a 'contemporaneous assertion' of that right." *Id*. ¶ 46. The court stated that nothing in the record suggested that the defendant "ever alerted the court of his desire to testify, that he had any questions about his right to testify, or that he otherwise was unsure

about waiving his right to testify." *Id*. ¶ 51. The court further explained, "petitioner's response during the trial court's admonishments unequivocally rebuts his allegations that his decision not to testify was involuntary or based on allegedly erroneous advice from counsel." *Id*. ¶ 54. The court further stated that taking the defendant's allegations as true, "the alleged off-the-record conversations with counsel on petitioner's right to testify occurred before the circuit court's admonishments," and therefore the defendant failed to make even an arguable showing of prejudice. *Id*. We find that the same reasoning applies here.

¶ 40 In the case at bar, Valencia claims that he did not make a knowing and voluntary waiver of his right to testify because his counsel advised against it due to the possibility of his juvenile adjudication being used against him. We note, however, that Valencia was admonished in open court about his right to testify or not testify, and he was the only person that could make that decision. The following colloquy took place:

> COURT: All right. Mr. Valencia, do you understand, sir, that you have a right to testify in this trial in your own defense if you wish to do so.
>
> VALENCIA: Yes.
>
> COURT: Do you understand you also have a right not to testify in this trial if that is your choice?
>
> VALENCIA: Yes.
>
> COURT: The decision about whether or not you or any other defendant testifies in their own defense is just like the decision whether or not you wish to take a jury trial or waive that jury trial. It is a personal decision to you alone. Do you understand that?

12

VALENCIA: Yes.

COURT: Is it your decision not to testify in this case?

VALENCIA: Yes.

COURT: Has anybody forced you or threatened you in any way to get you to make that decision?

VALENCIA: No.

COURT: Did anybody promise you anything to get you to make that decision?

VALENCIA: No.

COURT: And you are making that decision of your own free will?

VALENCIA: Yes.

COURT: Are there any other witnesses or defenses that you wanted your attorney to use in this case that he has not used or not called – any witnesses he hasn't called that you wanted him to call?

VALENCIA: No.

COURT: All right. I believe that the defendant's choice to exercise his constitutional rights has been made knowingly and voluntarily and intelligently."

¶ 41    Valencia never advised the court that he wished to testify during this exchange, and in fact, explicitly waived that right. Thus, as in *Knapp*, Valencia's responses in open court rebut his claim that he involuntarily waived his right to testify.

¶ 42    While we previously found that Valencia's claim regarding his right to testify had enough merit to advance Valencia's *pro se* petition to the second stage of postconviction proceedings, we also voiced "no opinion on the ultimate ruling which will result from allowing defendant's petition to advance in the proper procedural sequence." *Valencia*, 2016 IL App (1st) 133524-U, ¶ 33. Since that decision, our supreme court in *Knapp* found that summary dismissal was warranted at the first stage of postconviction proceedings, where the threshold to survive was low, because the defendant's allegations were positively rebutted by the record. It follows that Valencia's postconviction petition was properly dismissed at the second stage, where the threshold to survive was higher, because his allegations were similarly rebutted by the record. Accordingly, we find that Valencia failed to make a substantial showing in his second-stage petition that he was denied the right to testify based on trial counsel's alleged erroneous advice.

¶ 43                                 C. Sentence

¶ 44    Valencia's final contention on appeal is that he made a substantial showing in his second-stage postconviction petition that his 26-year sentence, as applied to him, resulted in a sentence that violated the proportionate penalties clause. The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Cons. 1970, art. I, §11. A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). Our supreme court has not defined what constitutes a cruel or degrading sentence that is "wholly disproportioned to the offense" because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id*. at 339. "To determine whether a penalty shocks the moral

sense of the community, we must consider objective evidence as well as the community's changing standard of moral decency." *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 45    It is well established that courts unequivocally distinguish juvenile offenders from adults when imposing life sentences. See *Miller v. Alabama*, 567 U.S. 460 (2012); *People v. Miller*, 2020 Ill. 2d 328 (2002). We know that "children lack maturity and have an underdeveloped sense of responsibility, are more vulnerable to negative influences, and have character that is not yet well formed." *People v. Woods*, 2020 IL App (1st) 163031, ¶ 56 (citing *Miller*, 567 U.S. at 471). In *Miller*, the Supreme Court held that "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" violates the Eighth Amendment of the United States Constitution because such a scheme, by making the factors of youth "irrelevant to an imposition of that harshest prison sentence, *** poses too great a risk of disproportionate punishment." *Id*. at 479. In *People v. Buffer*, 2019 IL 122327, our supreme court extended the constitutional protections set forth in *Miller* to juvenile defendants sentenced to more than 40 years in prison, finding that a sentence of 40 years or less provides a meaningful opportunity to demonstrate maturity and rehabilitation and obtain release. *Id*. ¶ 41.

¶ 46    Here, Valencia's sentence of 26 years' imprisonment is not a mandatory life sentence, nor is it a sentence of more than 40 years that our supreme court has determined would constitute a *de facto* life sentence. As such, Valencia's sentence does not raise the constitutional concerns expressed in *Miller* and *Buffer*. See *Woods*, 2020 IL App (1st) 163031, ¶ 57 (juvenile defendant's 33-year sentence did not raise the constitutional concerns in *Miller* and *Buffer*). Valencia's sentence, however, did include a mandatory 20-year enhancement because in committing the offense of attempted murder, he "personally discharged a firearm." 720 ILCS 5/8-4(c)(1)(C) (West 2020). Valencia, who was 17 years old when he committed the offense,

15

argues that the mandatory firearm enhancement violates the proportionate penalties clause as applied to him because it did not permit the court to give appropriate weight to his youth and rehabilitative potential.

¶ 47   This court has recently discussed this exact issue in *Woods*, where we noted that our supreme court has "clearly upheld the constitutionality of mandatory firearm enhancement provisions." *Woods*, 2020 IL App (1st) 163031, ¶ 58. "The court determined that these provisions did not violate the proportionate penalties clause because the legislature's purpose in enacting them, to account for the added danger when an offender uses a firearm in committing a felony, does not 'shock the conscience of the community.' " *Id.* (quoting *People v. Sharpe*, 216 Ill. 2d 481, 524-25 (2005)). The court in *Sharpe* reasoned that, in fixing a penalty for an offense, the potential for rehabilitation need not be given greater weight than the seriousness of the offense. 216 Ill. 2d at 525.

¶ 48   We further noted in *Woods* that in *People v. Wilson*, 2016 IL App (1st) 142500, ¶ 41, citing *Sharpe*, this court held that the application of a 25-year mandatory firearm enhancement to a 17-year-old defendant convicted of attempted murder did not shock the moral sense of the community. In *Wilson*, while noting that the defendant had no prior convictions, had a supportive family, and felt pressured by peers to shoot the victim, the evidence showed that he "pursued the victim down an alley, raised his firearm, and shot at the victim four times before fleeing." *Id.* ¶¶ 41, 43. This court found that, although "there were certain mandatory aspects of defendant's sentence, *** the trial court retained wide latitude to fashion a sentence. *Id.* ¶ 43. We concluded that the defendant's sentence of 31 years' imprisonment did not violate the proportionate penalties clause. *Id.*

16

¶ 49    Similar to the circumstances in *Wilson*, the defendant in *Woods* admittedly carried a gun to a location near a high school and bus stop where he got involved in a fight, pulled out a gun while fleeing, and then fired shots with about 30 people in the area. 2020 IL App (1st) 163031, ¶ 60. One of the shots hit an officer, who recovered from his injuries. *Id*. The trial court acknowledged the defendant's youth and his lack of a significant criminal record but found that his actions in firing the gun merited serious consequences. *Id*. This court found that the trial court exercised its discretion in sentencing the defendant, giving him little more than the minimum of 31 years but not imposing a natural or *de facto* life sentence. *Id*. Following *Wilson*, this court found in *Woods* that the defendant's 33-year sentence, which included a 25-year mandatory firearm enhancement, did not violate the proportionate penalties clause. *Id*. Following this same reasoning, we find that Valencia's 26-year sentence, which included a 20-year mandatory firearm enhancement, did not violate the proportionate penalties clause as applied to him.

¶ 50    Valencia maintains that our standard of moral decency is evolving, and that recent legislation enacted by our legislature now authorizes a trial court, in its discretion, to decline to impose any applicable firearm enhancement when sentencing a defendant who is under 18 years old at the time of the offense. See 730 ILCS 5/5-4.5-105(b) (West 2020). While we acknowledge the recent legislation, we note, as we did in *Woods*, that "there is no indication the General Assembly found that application of mandatory firearm enhancements to juvenile defendants shocked our sense of moral decency." 2020 IL App (1st) 163031, ¶ 62. The "new provision did not completely eliminate application of the mandatory firearm enhancements to juvenile defendants, nor did it make the provision retroactive." *Id*. (citing *People v. Hunter*, 2017 IL 121306, ¶ 56). "Our legislature clearly believed that, for juvenile defendants, mandatory firearm enhancements were appropriate in certain circumstances." *Id*.

¶ 51    Valencia also cites two appellate court cases that found the application of an adult sentencing scheme that included a mandatory firearm enhancement, to certain juvenile defendants, violated the proportionate penalties clause. See *People v. Aikens*, 2016 IL App (1st) 133578, ¶¶ 1, 37 (17-year-old defendant's 40-year sentence for attempted murder, which included a 20-year firearm enhancement, "shocks our evolving standard of moral decency" because defendant had no prior criminal history, was full of potential and able to rehabilitate, and had a social history that was troubling); *People v. Barnes*, 2018 IL App (5th) 140378, ¶¶ 1, 25 (finding that the 15-year mandatory firearm enhancement imposed on the 17-year-old defendant who committed armed robbery "shocks our evolving standard of moral decency" because the defendant had no prior criminal history, had rehabilitative potential, and did not harm anyone during the commission of the offense.) However, both *Aikens* and *Barnes* predate our supreme court's decision in *Buffer* that a *de facto* life sentence for a juvenile is more than 40 years (2019 IL 122327, ¶ 41). The *Miller* protections are only applicable where a defendant has received a natural or *de facto* life sentence, which is not the case here. See *People v. Hilliard*, 2021 IL App (1st) 200112, ("it is clear from our supreme court precedent that *Miller* is only appliable where a defendant has received a natural or *de facto* life sentence.")

¶ 52    Valencia's constitutional challenge to the truth-in-sentencing statute fails for the same reason. His 26-year sentence, even if served at 100%, is not a life sentence under any constitutional measure: he was not mandatorily sentenced to life in prison as prohibited by *Miller*, nor was he sentenced to a discretionary *de facto* life sentence as defined by *Buffer*. While Valencia argues that the truth-in-sentencing statute as applied to juveniles prevents him from obtaining an early release based on rehabilitation, in violation of the principles in *Miller*, we note that this court has rejected similar challenges. See *People v. Brakes*, 2021 IL App (1st) 181737, ¶

42 ("a juvenile defendant's sentence (whether served at 100%, 85%, or 50%) may be subject to a constitutional challenge only if it will keep the juvenile in person for more than 40 years.") We find that Valencia's as-applied challenge to the truth-in-sentencing statute must fail because requiring a juvenile to serve 100% of a term-of-years, non-*de facto* life sentence for murder does not violate the principles set forth in *Miller*.

¶ 53                                III. CONCLUSION

¶ 54    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 55    Affirmed.