2021 IL App (1st) 180550
No. 1-18-0550

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 02 CR 03169 |
| | ) | |
| JAMES SMITH, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Brian Flaherty, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Coghlan and Walker concur in the judgment.

**ORDER**

¶ 1    *Held*: circuit court order dismissing the defendant's petition for postconviction relief following a third-stage evidentiary hearing affirmed where the defendant failed to establish by the preponderance of the evidence that his trial attorneys rendered ineffective assistance by depriving him of his constitutional right to testify.

¶ 2    Defendant James Smith appeals the circuit court's dismissal of his petition for postconviction relief following a third-stage evidentiary hearing conducted in accordance with the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2020)).  On appeal, he contends that the circuit court erred in dismissing his petition because he established by the preponderance of the evidence that his trial attorneys improperly denied him his constitutional right to testify during his jury trial.  For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 3    BACKGROUND

¶ 4    On the evening of January 14, 2002, Ronald Branch, the estranged husband of defendant's live-in girlfriend, Loletta Brown, was shot and killed. Defendant, who had a history of conflict with Branch, was arrested and charged with first degree murder in connection with those events.

¶ 5    Following his arrest, defendant met with attorneys from Jenner & Block and signed a *pro bono* engagement letter obtaining their legal services. The letter provided that defendant would "not be charged for time spent by attorneys or paralegals on this matter, or for [any] out-of-pocket expenses." Although the letter specified that defendant would not be responsible for paying any legal fees, paragraph 4 of the letter required him to "cooperate fully" with any of Jenner & Block's efforts to "recover attorneys' fees or expenses from the opposing party or the Court under any statute or rule of law" and provided that "any such recovery w[ould] belong exclusively to Jenner & Block, LLC." After signing the engagement letter, David Ekman-Jimenez and Erin Schrantz, two attorneys from Jenner & Block, began to represent him. After obtaining counsel, defendant posted bond and ultimately elected to proceed by way of a jury trial.

¶ 6    Before the trial commenced, the circuit court was advised of the history of conflict that existed between defendant and Branch and ruled that evidence of prior altercations initiated by Branch against defendant could be introduced at the trial in accordance with the Illinois supreme court's decision in *People v. Lynch*, 104 Ill. 2d 194 (1984).

¶ 7    Trial[1]

---

[1] Given the procedural posture of this case, we elect not to recount the trial evidence in detail; rather, we are simply providing an overview of the relevant evidence presented at trial. This court thoroughly recounted and analyzed the trial evidence when resolving defendant's direct appeal. See *People v. Smith*, 1-05-1535 (March 31, 2008) (unpublished order pursuant to Rule 23).

¶ 8        The State's evidence at trial established that Brown and Branch married in 1995 and had one child during their union, Neon Branch. Brown also had two other biological children from a prior relationship: Loletta Wise and Jonathan Wise. Brown lived with Branch and her three children in Forest Park, Illinois. In 2000, Brown met defendant at work, and they commenced a romantic relationship. Branch learned of Brown's affair in August 2000 and physically attacked her at their home prompting her daughter, Loletta, to call the police. Following the attack, Brown and her three children moved out of the residence that she shared with Branch and moved in with a friend. When Branch began to stalk her at her friend's home, Brown and her children subsequently moved into defendant's residence, which was located several blocks away from the home she had shared with Branch in Forest Park. Branch, however, continued to stalk Brown at defendant's house as well as at her place of employment. Branch also began to act aggressively toward defendant.

¶ 9        On one occasion in September 2000, Branch attacked defendant when defendant arrived to pick up Brown from work during her lunch break. Branch positioned his work van in a manner that prevented defendant from exiting the parking lot, pulled defendant from his vehicle, and struck defendant in his face and head. Defendant, in turn, brandished a knife, which he used to cut Branch's hand. The altercation was ultimately broken up by the police. On another occasion, Branch followed defendant in his car and attempted to drive defendant off the road. He also purportedly threw a brick through defendant's window. In addition to physical acts of aggression, Branch also verbally threatened to kill defendant on multiple occasions. Defendant, in turn, responded by issuing threats to Branch.

¶ 10        Despite the interpersonal issues that existed between Brown, Branch, and defendant, Branch continued to have regular visitation with his son and his stepchildren. On January 14, 2002, Branch spent time with Neon and Jonathan to celebrate Jonathan's birthday while Brown remained at

home with defendant and her daughter. That evening, defendant became agitated and repeatedly told Brown that if Branch came to his house, he would kill Branch. Defendant began to pace the hallways of his house with a gun in one hand a knife in the other and when Brown reminded him that her sons were with Branch, defendant responded, "oh well." Brown became concerned with defendant's behavior and wanted to call the police; however, he prevented her from doing so. As a result, Brown instructed her daughter to pack up items belonging to her and her brothers. Brown then gave defendant her house key and began putting her family's personal items into her car, which was parked in the driveway. Defendant was standing at the end of his driveway as she did so. At that point, Branch stopped his work van across the street from defendant's house to drop off Brown's two boys. Upon observing Branch's arrival, defendant walked up to Branch's van and fired several shots at him. Branch had not lowered his window or attempted to get out of the vehicle before the shots were fired. Following the shooting, Branch's van rolled forward until it struck a tree located down the street and came to a stop.

¶ 11    Police officers arrived at the scene within minutes of the shooting and defendant, who dropped the gun on the driveway, acknowledged shooting Branch, stating, "I did the shooting, I'm tired of all this shit." Law enforcement officials recovered the weapon from the ground as well as ammunition from defendant's person.

¶ 12    An autopsy of Branch's body revealed that he sustained gunshot wounds to his left arm as well as to the left side of his chest and that he died as a result of those injuries. In addition, stippling evidence revealed that Branch was shot at close range.

¶ 13    Following the State's evidence, the defense called a series of witnesses, including one of defendant's neighbors who had previously observed Branch drive his work van past defendant's house several times per week. The neighbor also testified that Branch parked his van outside

defendant's home on multiple occasions as well. Sometimes, the children were around when Branch stopped his van near defendant's home; on other occasions, however, the children were not present when Branch did so.

¶ 14    The defense also introduced evidence that law enforcement officials conducted an inventory search of Branch's van following the shooting. During that search, officers found a duffle bag containing a utility knife inside the vehicle.

¶ 15    Defendant ultimately elected not to testify after receiving admonishments in open court. His waiver was made during the course of the following exchange:

"THE COURT: Mr. Smith, you understand you have a constitutional right to testify, absolute right to testify [o]n your own behalf? Understand that sir?

[DEFENDANT]: Yes, sir.

THE COURT: You also have the absolute right not to testify and rely on the presumption of innocence. Do you understand that, sir?

[DEFENDANT]: Yes.

THE COURT: Have you discussed your case with your lawyer?

[DEFENDANT]: Yes, I have.

THE COURT: Do you desire to testify [or] rely on the presumption of innocence or not testify?

[DEFENDANT]: Correct

THE COURT: Which one? Do you want to testify or not testify?

[DEFENDANT]: No, I don't want to testify.

THE COURT: And you've discussed this matter with your lawyer?

[DEFENDANT]: Yes.

THE COURT: You may be seated. Thank you very much."

¶ 16    At the close of the evidence, the jury received instructions pertaining to first degree murder, second degree murder, and self-defense. Defendant was found guilty of first degree murder and was sentenced to a total of 60 years' imprisonment.

¶ 17    Posttrial Proceedings

¶ 18    Defendant appealed his conviction, raising a number of claims; however, none of those claims pertained to the waiver of his right to testify. On review, this court ultimately rejected his claims of error and affirmed defendant's conviction, but ordered that his mittimus be corrected. *People v. Smith*, 1-05-1535 (unpublished order under Supreme Court Rule 23) (March 31, 2008).

¶ 19    Thereafter, on May 15, 2009, defendant filed the instant postconviction petition.[2] The *pro se* petition contained a number of contentions of error,[3] including an allegation that his trial counsel deprived him of his constitutional right to testify when "he coerced [defendant] not to testify to his state of mind leading up to the shooting death of Ronald Branch." Specifically, defendant alleged:

> "Several times prior to trial and while trial was in process, [he] repeatedly informed his
>
> trial attorney he wanted to testify that at the time he shot and killed the victim he was afraid
>
> for his life based on the following three factors: (1) The frequency of the victim[']s prior
>
> attacks on him—the defendant; (2) The victim's many threats to kill him—the defendant;

---

[2] Defendant also filed a *pro se* postconviction petition in November 2008 alleging he was deprived of his right to effective assistance of trial counsel. That petition, however, was never ruled upon and is not relevant to this appeal.

[3] Although not relevant to this appeal, we note that defendant's petition for postconviction relief contained the following additional claims of error: (1) he was denied a fair and impartial jury when the circuit court denied defense counsel's attempts to strike two prospective jurors for cause; (2) the circuit court erred in sustaining the State's objections to defense counsel's examination of two witnesses; (3) the circuit court imposed an excessive sentence; and (4) he was denied his right to effective assistance of appellate counsel.

and (3) The victim had recently purchased a gun and had shown it to others telling them he was going to use it on him—the defendant."

¶ 20    Defendant further alleged:

"During one of the trial recesses [his] trial counsel told defendant that counsel would not put defendant on the stand to testify under any circumstances.  Defense counsel then told defendant that if he persisted in testifying he would withdraw from the case and defendant would not get a refund on the fee he had already paid for a defense attorney.  Because defendant was afraid to be without an attorney, could not afford to hire another attorney, and did not want to lose the fee he had already paid trial counsel, defendant submitted to the will of his counsel's pressures not to testify.  When the court asked defendant if he wanted to testify, because he did not want to be without any attorney for the remainder of the trial and did not want to be without a fee for another attorney, he said no."

¶ 21    Defendant's postconviction petition advanced to the second stage of post-conviction review and counsel was appointed to represent him.  The State subsequently filed a motion to dismiss defendant's petition, which the circuit court granted.  Defendant appealed, and after reviewing the claims contained in the petition, this court found that defendant's petition made a substantial showing that he was denied his right to effective assistance of counsel predicated on the improper denial of his right to testify and remanded the case for a third-stage evidentiary hearing on that issue only.  *People v. Smith*, 2015 IL App (1st) 123708-U (unpublished order under Supreme Court Rule 23) (February 3, 2015).  We explained our ruling as follows:

"Accepting the allegations in defendant's petition as true and construing them liberally for purposes of a second stage proceeding, we find that the petition supports a substantial showing that he was denied effective assistance of counsel at trial.  In reaching this

conclusion, we are persuaded by the argument that evidence of defendant's purported perception of a physical threat from the victim would have been relevant to the jury's determination of whether defendant acted in self-defense, or whether defendant's actions amounted to the lesser mitigated offense of second degree murder. Moreover, evidence of defendant's subjective belief at the time he encountered and shot Branch—regardless of whether a jury found it to be objectively reasonable—could only have been elicited through defendant's own testimony. Brown's testimony that defendant said he would kill Branch if the latter showed up at the house does not foreclose the possibility that defendant perceived Branch as a threat, particularly when viewed against the evidence at trial that revealed a prior history of confrontation between the two men. As such, there is a reasonable probability that the jury would have reached a different verdict had it considered testimony by defendant regarding his subjective state of mind and belief as to the existence of a threat—regardless of whether it was objectively reasonable—at the time he shot Branch. For these reasons, we find that defendant has sufficiently alleged facts to avoid a second stage dismissal of his postconviction claim of ineffective assistance of counsel. Our finding today does not suggest, however, that defendant's allegations regarding his perception of a threat would outweigh any evidence challenging the credibility or reasonableness of his alleged perception. We simply conclude that defendant's petition— which contain well-pled allegations that must be taken as true, is legally sufficient and establishes a substantial showing of a constitutional violation based on ineffective assistance of counsel. Therefore, a third stage evidentiary hearing is warranted." *Id.* ¶ 22.

¶ 22    On remand, the circuit court presided over the requisite third-stage hearing. At the hearing, defendant testified that attorneys from Jenner & Block met with him at the Cook County jail

following his arrest and that he signed a *pro bono* engagement letter to obtain their legal services. Thereafter, he had "consultations" with his attorneys prior to the start of his trial. During these consultations, defendant and his attorneys prepared to argue that he acted in self-defense when he shot Branch. Defendant told his attorneys that he wanted to testify and his attorneys "went over" various questions with him to prepare him to testify at the upcoming trial. Ultimately, however, defendant did not testify at trial, explaining "I trusted Jenner and Block, because it was a self-defense case, and I was afraid if I got on the stand that they would withdraw from the case." His fear that his attorneys would withdraw was predicated on a discussion he had with them during a trial recess after the State rested its case. During that discussion, his attorneys emphasized that the State and its "chief witness" bore the burden of proving defendant's guilt and that he did not need to testify.

¶ 23    Defendant acknowledged that when the trial resumed, the trial judge informed him that he had the right to testify and asked him if he wanted to testify. Defendant further also acknowledged informing the trial judge that he did not want to testify but explained that he only did so because his attorneys indicated that they would withdraw if he elected to testify. He also believed that paragraph four of the *pro bono* engagement letter that he signed, which required him to cooperate with any of Jenner & Block's efforts to collect attorney's fees, would have allowed his attorneys to take $15,000 sum he posted as bond if they withdrew their representation in the middle of trial. Based on his understanding of paragraph four, he believed that "any funds, anything involved, would go to Jenner [&] Block."

¶ 24    Defendant stated that if he would have testified at trial, he would have explained the events that led to the shooting. Specifically, he would have testified that on the day of the shooting, he spoke to Brown and told her she had to leave his home. As they were putting bags into their

respective vehicles, which were both parked in the driveway, defendant heard a "screeching sound." When he looked up, defendant observed Branch's vehicle. Defendant was familiar with Branch and his vehicle because Branch had stalked defendant at his place of employment and his home on multiple occasions in the past. Branch had also "run [defendant] off the roadway" and threatened to kill defendant. In addition, Branch had physically assaulted defendant approximately one month before the day of the shooting. During that attack, Branch struck defendant's head, which caused defendant to suffer seizures and required him to undergo brain surgery to repair the damage. In light of the "other incidents" between the two men, defendant "knew" that Branch was "coming to kill [him]." As a result, defendant reached into his car, pulled out his gun, stepped back, and "fired a warning shot in[to] the ground." At that point, Branch, who was still seated in his vehicle, "bent over" as if he was reaching for something. When Branch "came back up," defendant "fired two more shots."

¶ 25        On cross-examination, defendant acknowledged that he was on antiseizure medication during the trial. He also acknowledged that he spoke to both of his attorneys prior to trial and discussed his desire to testify; however, he "remember[ed] speaking to Ms. Schrantz more so than Mr. Jiminez." Defendant admitted that he did not have any problems communicating with his attorneys and was aware of their theory of the case, which was that he acted in self-defense. During the trial recess, when he told his attorneys he wanted to testify, they told him that there was "no need" for him to testify in light of the weak testimony provided by Brown, the State's "key witness." Although he wanted to testify, defendant admitted that he understood the admonishments that the circuit court provided him pertaining to his constitutional right to testify and that he informed the court that he did not want to exercise his right to testify at his trial. Finally, defendant testified

that his attorneys never explained that they were representing him free of charge and never specifically explained the language contained in paragraph 4 of the *pro bono* engagement letter.

¶ 26      Following defendant's testimony, the State called David Ekman-Jimenez to testify. He explained that he was a partner at Jenner & Block and that he represented various criminal defendants over the years *pro bono*, including defendant. Erin Schrantz, another attorney at Jenner & Block, partnered with him to represent defendant at trial. Ekman-Jimenez did not specifically recall discussing the terms of the *pro bono* engagement letter that defendant signed in March 2003, but testified that he was "sure either [he] or Ms. Schrantz did." He explained that such a discussion is had during "the normal course of representing [their] *pro bono* clients" and that defendant "certainly knew over the course of the representation that [they were not] charging him a fee." As part of their representation of defendant, Jenner & Block hired a private investigator and "[m]embers of the team spoke with essentially every witness who would speak with [them]." He and Schrantz also discussed the possibility of defendant testifying at trial. Specifically, they "spoke to [defendant] collectively at some length about what he might say if he testified." Ekman-Jimenez explained that when he has conversations with clients about their right to testify, he "tell[s] them a couple of things. Number one, I always tell them that it is fundamentally their choice whether to testify; that the lawyers get to make some decisions regarding the case, but the decision whether to testify on his or her behalf is always ultimately the client's. I also say that we will give a recommendation about testifying. We talk always about the risks and potential benefits of testifying. And I always emphasize to the clients because it's true in my experience that if a client is caught in a lie on the stand, particularly during a jury trial, there's a very substantial risk of being convicted of the crime even if the lie doesn't directly relate to whether or not they committed the crime."

¶ 27     Ekman-Jimenez testified that prior to trial, the agreed upon defense strategy was that defendant shot Branch in self-defense, explaining: "The evidence was undisputed. There were statements in the case and eyewitnesses that [defendant] was the shooter, so there was no identity defense. So really the only issue in the case was whether there was legal justification for the shooting. And the legal justification that we thought we could present to the jury related to self-defense." When asked whether he and Schrantz intended for defendant to testify at trial to advance their chosen self-defense strategy, Ekman-Jimenez stated: "I'm not sure whether we had a specific intention. We certainly would have had [defendant] testify if we thought it would advance the theory of self-defense, and so we investigated that possibility at some length." As a result, he and Schrantz "prepped" defendant prior to trial. Notes in defendant's file reflected that "there were three sessions at least over the course of a week lasting approximately three hours each" that Schrantz spent with defendant prepping him for trial. Ekman-Jimenez testified that he "may have participated to a greater or lesser extent in some or all of those sessions."

¶ 28     He also acknowledged speaking to defendant about the possibility of him testifying during a recess at trial after the State finished presenting its evidence. During that conversation, Ekman-Jimenez "strongly recommended that [defendant] not testify," because "[a]t that point in the case, [the defense] had proffered substantial pieces of evidence, mostly testimonial, in favor of the self-defense theory. The judge had made a number of rulings that permitted this evidence in under the *People v. Lynch* case, and essentially the judge had allowed [them] to present the defense almost unfettered. [They] had gotten in most everything that [they] had asked to get in." In addition, Ekman-Jimenez had "concerns" about defendant testifying because his testimony during the pretrial preparation sessions "was inconsistent with some of the prior statements that he had made, and despite further preparation, it remained somewhat inconsistent. And under those

circumstances, [he and Schrantz] thought there was a high risk that the jury might think [defendant] was lying, even if it wasn't directly related to his subjective state of mind at the time that the killing—that the shooting occurred." At the end of their conversation, defendant decided not to testify. Ekman-Jimenez denied that he ever informed defendant that he would withdraw his representation if defendant wanted to testify. He explained that there are "certain circumstances under which one might have to withdraw" in the middle of a trial, but that a "disagreement over whether the defendant is going to testify is not one of them." Ekman-Jimenez also denied that he ever threatened to keep the bond money that defendant had posted if defendant testified, explaining he "had no claim to the bond money of any kind." Finally, Ekman-Jimenez testified that when the circuit court admonished defendant at trial that he had the right to testify, defendant never informed the court or his attorneys that he wanted to testify; rather, he expressly waived his right to do so.

¶ 29    On cross-examination, Ekman-Jimenez testified that he and his partner were able to "elicit testimony [at trial] that showed the violent acts and threats of the victim" toward defendant, which supported their theory of self-defense. His recommendation that defendant not testify was based on his belief that "the case was not going to get any better for self-defense than it was" at that point. He did not recall defendant stating that he wanted to testify during the conversation they had during the trial recess. If defendant had insisted on testifying, Ekman-Jimenez stated that he would have put him on the stand because it was ultimately defendant's decision to make. Based on his recollection, defendant decided not to testify following his attorneys' recommendation that he not do so.

¶ 30    Ekman-Jimenez testified that notes contained in defendant's file reflected concerns over the "inconsistencies" in his testimony during pretrial preparation sessions as well as the fact that he included "irrelevant information" in his testimony. The notes also reflected that defendant

reported that he was not feeling well, had difficulties sleeping, and was experiencing seizures. When asked about the *pro bono* engagement letter that defendant signed, Ekman-Jimenez stated that paragraph 4 of that letter contained a requirement that defendant would cooperate with any efforts that Jenner & Block made to recover attorney fees from the opposing party or the court. He acknowledged that the provision did not explicitly state that bond money would not be used to recoup expenses, but stated that the letter did not contain any references to bond money at all.

¶ 31     After presenting the aforementioned evidence, the parties delivered their respective arguments concerning the merits of defendant's ineffective assistance of counsel claim and the circuit court took the matter under advisement. At a subsequent court date, the court dismissed defendant's petition for post-conviction relief, explaining its rationale, in pertinent part, as follows:

> "I find that Defendant's attorney was a credible witness, very credible witness, who was prepared to put Defendant on the stand, but made a recommendation, based on all the facts that were available to him at the time. That the Defendant's attorney told Defendant that he was free to ignore that recommendation and testify in this case and that it was his right to testify and only the Defendant's right to testify.
>
> As a side note, anybody who has practiced criminal law knows that putting a defendant, specifically one who has already given a statement, putting that defendant on the stand is an extremely risky proposition. Any impeachment of the defendant—and I agree with the Defense attorney—could affect the defense the Defendant was attempting to put forth, in other words, self-defense.
>
> I find there was no threat made to the Defendant by his attorneys, either a threat to withdraw or a threat to keep any bond money. The Defendant was admonished by Judge Baker, and he replied that he did not want to testify.

Under the *Strickland* analysis, the Defendant failed to show even the first prong that his [attorneys'] performance fell below an objective standard of reasonableness.

What we have here, insofar as I am concerned, Defendant knowingly and voluntarily waived his right to testify, and he did that based on the recommendation of the lawyers. The case didn't turn out as he hoped it would because he was found guilty. And so now he is saying that his attorneys threatened to withdraw and threatened to keep his bond money, which I find did not happen. \*\*\*

This post-conviction [petition] is dismissed after hearing the evidence. Stage three."

¶ 32    This appeal followed.

¶ 33    ANALYSIS

¶ 34    On appeal, defendant argues that the "circuit court erred in denying the post-conviction petition where [he] demonstrated by a preponderance of the evidence that he was prejudiced by his attorneys' deficient performance that prevented him from testifying at trial." He notes that although Ekman-Jimenez testified that he never threatened to withdraw if defendant exercised his constitutional right to testify, "the State failed to present any evidence" that his other trial attorney, Erin Schrantz, never issued the same threat.

¶ 35    The State responds that the circuit court "properly dismissed petitioner's post-conviction petition after the third stage evidentiary hearing" where one of his trial attorneys testified that no threat to withdraw representation was made and where the court "explicitly found [his] claim that he was coerced incredible."

¶ 36    The Act provides a mechanism pursuant to which criminal defendants who have suffered a substantial violation of their constitutional rights at trial may obtain relief. 725 ILCS 5/122-1 *et seq*. (West 2020)); *People v. Edwards*, 197 Ill. 2d 239, 243-44 (2001). Postconviction proceedings

are not a substitute for a direct appeal; rather, the Act simply "offers a mechanism for a criminal defendant to assert a collateral attack on a final judgment." *People v. Robinson*, 2020 IL 123849, ¶ 42. To prevail on a claim for postconviction relief filed pursuant to the Act, "a defendant must show that he has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged." *People v. Pendelton*, 223 Ill. 2d 458, 471 (2006). The Act provides for three distinct stages of review. *People v. Knapp*, 2020 IL 124992, ¶ 43; *People v. Domagala*, 2013 IL 113688, ¶ 32.

¶ 37    At the first stage, it is incumbent upon the defendant to file a petition that "clearly set[s] forth the respects in which [his] rights were violated" (*People v. Coleman*, 183 Ill. 2d 366, 379 (1998)) and the circuit court may only dismiss the petition if the claims set forth therein are "frivolous or patently without merit" (725 ILCS 5/122-2.1(a)(2) (West 2020)). A petition is subject to summary dismissal as frivolous or patently without merit if it has no arguable basis in either fact or law. (*Domagala*, 2013 IL 113688, ¶ 32) or where it "relies on ' "an indisputably meritless legal theory or a fanciful factual allegation" ' " (*Knapp*, 2020 IL 124992, ¶ 45 (quoting *People v. Allen*, 2015 IL 113135, ¶ 25 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009)).

¶ 38    If the circuit court does not summarily dismiss the petition, it proceeds to the second stage, where an indigent defendant may obtain appointed counsel and the State may move to dismiss the petition. 725 ILCS 5/122-2.1(b), 122-4, 122-5 (West 2020). "The second stage of postconviction review tests the legal sufficiency of the petition." *Domagala*, 2013 IL 113688, ¶ 35. At the second stage, the circuit court does not engage in any fact-finding or make credibility determinations (*Coleman*, 183 Ill. 2d at 385); rather, unless the defendant's allegations are affirmatively rebutted by the record, the circuit court must consider all the well-pleaded facts in the petition and in the accompanying affidavits to be true, and must simply ascertain "whether the petition and any

accompanying documentation makes a 'substantial showing of a constitutional violation.' " (*Domagala*, 2013 IL 113688, ¶ 13 (quoting *Edwards*, 197 Ill. 2d at 246).

¶ 39       If a petition makes this substantial showing, it then advances to the third and final stage of postconviction review, where an evidentiary hearing is held to determine the truth of the allegations contained in the petition. 725 ILCS 5/122-6 (West 2020). "The evidentiary hearing allows the parties to develop matters not contained in the trial record" (*People v. Pabello*, 2019 IL App (2d) 170867, ¶ 21), and during that hearing, the court has "wide discretion" to consider various pieces of evidence (*People v. Coleman*, 206 Ill. 2d 261, 286 (2002)) including affidavits, depositions, and oral testimony, and may order the defendant be brought before the court (725 ILCS 5/122-6 (West 2020)). At a third-stage hearing, "the defendant no longer enjoys the presumption that the allegations in his petition and accompanying affidavits are true." *People v. Gacho*, 2016 IL App (1st) 133492, ¶ 13. Instead, the defendant bears the burden to " 'show a denial of [a] constitutional right by a preponderance of the evidence.' " *People v. Coleman*, 2013 IL 113307, ¶ 92 (quoting *People v. Stovall*, 47 Ill. 2d 42, 47 (1970)). During the hearing, the circuit court acts as the fact-finder and is charged with resolving conflicts in the evidence and determining the credibility to afford to any witnesses. *Domagala*, 2013 IL 113688, ¶ 34. Following a third-stage hearing in which the circuit court engages in fact-finding and makes credibility determinations, the court's ruling will not be disturbed unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. "Manifest error is that which is 'clearly evident, plain, and indisputable.' " *Gacho*, 2016 IL App (1st) 133492, ¶ 15 (quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)). If, however, no new evidence is presented and the issues raised are purely questions of law, then the court's judgment is subject to *de novo* review. *English*, 2013 IL 112890, ¶ 23.

¶ 40 Here, the court heard testimonial evidence from defendant and Ekman-Jimenez, one of his trial attorneys, and made credibility determinations. Accordingly, its judgment will not be disturbed unless it is manifestly erroneous.

¶ 41 On review, the only issue before this court is whether defendant established by the preponderance of the evidence that trial counsel rendered ineffective assistance by improperly denying him his constitutional right to testify. To prevail on a claim of ineffective assistance of trial counsel, a defendant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced defendant. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984); *People v. Baines*, 399 Ill. App. 3d 881, 887 (2010). With respect to the first prong, the defendant must overcome the "strong presumption" that counsel's action or inaction was the result of sound trial strategy. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001); *People v. Shelton*, 401 Ill. App. 3d 564, 583 (2010). " 'In recognition of the variety of factors that go into any determination of trial strategy, *** claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review.' " *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79 (quoting *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002)); see also *People v. Mitchell*, 105 Ill. 2d 1, 15 (1984) ("The issue of incompetency of counsel is always to be determined from the totality of counsel's conduct."). To satisfy the second prong, the defendant must establish that, but for counsel's unprofessional errors, there is a reasonable probability that the trial court proceeding would have been different. *People v. Peeples*, 205 Ill. 2d 480, 513 (2002). A defendant must satisfy both the performance and prejudice prongs of the

*Strickland* test to prevail on an ineffective assistance of counsel claim. *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 42    Every criminal defendant has a fundamental constitutional right to decide whether or not to testify at his or her trial. *Knapp*, 2020 IL 124992, ¶ 46; *People v. Madej*, 177 Ill. 2d 116, 145-46 (1997). Accordingly, although an attorney may provide advice to his or her client about the potential benefits or pitfalls of testifying at trial, the ultimate decision whether or not to exercise that right belongs solely to the defendant (*Knapp*, 2020 IL 124992, ¶ 46; *People v. Youngblood*, 389 Ill. App. 3d 209, 217 (2009)), and only the defendant may waive his or her right to testify (*Madej*, 177 Ill. 2d at 146). As a general rule, an attorney's representation will not be found to be ineffective simply because counsel advised the defendant not to testify; rather, counsel will only be found to be ineffective where the "evidence suggests that counsel *refused to allow* the defendant to testify." (Emphasis added.) *Youngblood*, 389 Ill. App. 3d at 217.

¶ 43    Based on the record and the evidence presented during the evidentiary hearing, we conclude that the trial court did not err in finding that defendant knowingly and voluntarily waived his right to testify and properly rejected his ineffective assistance of counsel claim. First, we note that defendant was admonished in open court about his right to testify. The court informed defendant that he had an "absolute right" to choose to testify or to choose not to testify and rely on the presumption of innocence. The court then inquired whether he understood his rights and whether he had "discussed the matter" with his attorneys. In response to the court's inquiries, defendant acknowledged that he understood his rights, that he had conferred with trial counsel, and that he did not want to testify. Although the court did not specifically advise defendant that the choice whether or not to testify was a choice that belonged to him alone and not to his attorneys, it is well established that no such specific admonishment is required. See *People v. Smith*, 176 Ill. 2d 217,

234-35 (1997) ("[T]he trial court is not required to advise a defendant of his right to testify, to inquire whether he knowingly and intelligently waived that right, or to set of record defendant's decision on this matter"). Even if it would undoubtably be a better practice to include such a specific admonishment on the record, we note that defendant did not express any confusion about his rights or hesitancy in waiving his right to testify. See generally *In re Joshua B.*, 406 Ill. App. 3d 513, 515 (2011) (recognizing that a defendant's claim that he was denied his right to testify at trial will not generally be a basis for reversal unless the defendant contemporaneously asserted his right by informing the trial court that he wished to testify); *People v. McCleary*, 353 Ill. App 3d 916, 923 (2004) (same); see also *People v. Enis*, 194 Ill. 2d 361, 399-400 (2000) ("In the absence of a contemporaneous assertion by defendant of his right to testify, the trial court properly rejected this post-conviction claim").

¶ 44        Although defendant later testified during the evidentiary hearing that his waiver was only made in response to threats that his attorneys would withdraw their representation in the middle of trial and abscond with his bond money if he chose to testify, David Ekman-Jimenez flatly contradicted defendant's account. Although Ekman-Jimenez admitted that he discussed the possibility of defendant testifying during a trial recess, he denied that he ever threatened to withdraw his representation or keep defendant's bond money if defendant exercised his constitutional right. Instead, he recalled that he "strongly recommended" that defendant not testify, and that defendant made the decision not to do so following their discussion. Ekman-Jimenez explained that his recommendation was predicated on the fact that the trial court's pre-trial *Lynch* ruling had allowed the defense to introduce the evidence necessary to support defendant's claim of self-defense. In addition, he was concerned that defendant's testimony could potentially hinder that defense given the "inconsistencies" in his accounts that were apparent during their pretrial preparation sessions.

Despite his misgivings, Ekman-Jimenez testified that he would have put defendant on the stand if defendant had insisted on testifying because that was his decision to make; however, defendant never stated his desire to do so. The circuit court heard these conflicting accounts, deemed Ekman-Jimenez a "very credible witness," and found "there was no threat made to the Defendant by his attorneys, either a threat to withdraw or a threat to keep any bond money."

¶ 45   Despite the circuit court's finding that Ekman-Jimenez was a "very credible witness" and that "there was no threat made to him by his *attorneys*" (Emphasis added), defendant argues that the circuit court erred in dismissing his petition because the State never called Erin Schrantz, his other trial attorney, to rebut his claim that such a threat has been made. We disagree. Initially, we note that in his petition for post-conviction relief, defendant's petition focused almost exclusively on the conduct of his male attorney. For example, he alleged that he "inquired of his attorneys during court recess when he would be getting a chance to tell his side of the story of what happened the day decedent was shot and killed [and] his trial counsel told him *he* was not going to put him on the witness stand." (Emphasis added.) Defendant further alleged: "During one of the trial recesses defendant's trial counsel told defendant that counsel would not put defendant on the stand to testify under any circumstances. Defense counsel then told defendant that if he persisted in testifying *he* would withdraw from the case and defendant would not get a refund on the fee he had already paid for a defense attorney." (Emphasis added.) Defendant's petition did not identify any specific threat or conduct attributable solely to his female trial attorney; rather, when a gender specific pronoun was used in the context of his ineffective assistance of counsel claim, defendant utilized the male pronoun. Based on the evidence in the record, Ekman-Jimenez was the only male attorney who represented defendant at trial, and he denied that he ever issued any threats to defendant or prevented him from testifying.

¶ 46    Defendant likewise failed to identify any improper conduct attributable solely to Shrantz at the evidentiary hearing. Although he testified at the evidentiary hearing that his belief that his attorneys would withdraw was predicated on a conversation that took place during a trial recess, he did not identify any improper statement or threat that she, alone, purportedly made during that conversation that interfered with his constitutional right to testify. Even if defendant had identified such a statement, we note that the circuit court found that he lacked credibility as a witness. In delivering its ruling, the court expressly stated: "What we have here, insofar as I am concerned, Defendant knowingly and voluntarily waived his right to testify, and he did that based on the recommendation of the lawyers. The case didn't turn out as he hoped it would because he was found guilty. And so now he is saying that the attorneys threatened to withdraw and threatened to keep his bond money, which I find *did not happen*." (Emphasis added.)

¶ 47    We reiterate that it was defendant's burden to prove by a preponderance of the evidence that he was denied his right to effective assistance of trial counsel. See generally *Coleman*, 2013 IL 113307, ¶ 92 (recognizing that it is the defendant's burden to prove a denial of a constitutional right by the preponderance of the evidence). The record shows that defendant was admonished of his right to testify in open court and waived that right following consultation with counsel. Defendant and Ekman-Jimenez, one of his trial attorneys, both provided testimony at the third-stage evidentiary hearing about a conversation that occurred during a trial recess that preceded defendant's waiver. While defendant testified that his attorneys threatened to withdraw their representation and abscond his money if he chose to exercise his right to testify, Ekman-Jimenez denied issuing any such threats. Defendant never identified any threat issued to him solely by Shrantz, his other trial attorney, either in his petition or at the hearing. The circuit court carefully considered testimony from defendant and Ekman-Jimenez, deemed Ekman-Jimenez to be the more

credible witness, and expressly found that no threats were made to defendant. Ultimately, based on the record we are unable to conclude that the circuit court erred in rejecting defendant's claim that trial counsel wrongfully denied him his right to testify at his trial; rather, we find that the circuit court properly dismissed defendant's petition for postconviction relief following a third-stage evidentiary hearing.

¶ 48    CONCLUSION

¶ 49    The judgment of the circuit court is affirmed.

¶ 50    Affirmed.