2025 IL App (4th) 240885-U

NOS. 4-24-0885, 4-24-0886 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
October 9, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Henry County |
| TRAVIS J. WILLIAMS, | ) | Nos. 16CF411 |
| Defendant-Appellant. | ) | 16CF412 |
| | ) | |
| | ) | Honorable |
| | ) | Colby G. Hathaway, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Presiding Justice Harris and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed the dismissal of defendant's postconviction petition
at the second stage of proceedings, finding defendant failed to make a substantial
showing of his actual innocence or that he was denied the right to testify based
upon his trial counsel's performance.

¶ 2   Defendant, Travis J. Williams, appeals the trial court's dismissal of his
postconviction petition at the second stage of the proceedings under the Post-Conviction Hearing
Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)). Defendant argues (1) the court ignored the
standard applicable to a second-stage proceeding by finding the hearsay statements in a written
witness statement submitted in support of the petition were insufficient to support a claim of
actual innocence and (2) his petition established he was denied his right to testify at trial to prove
his innocence. We affirm.

¶ 3                    I. BACKGROUND

¶ 4                    A. Initial Charges and Joinder of the Cases

¶ 5          In November 2016, defendant was charged in separate cases for alleged criminal sexual conduct perpetrated against two of his daughters. In Henry County case No. 16-CF-411, defendant was charged with 10 counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2004)) and 5 counts of criminal sexual assault (*id.* § 5/12-13(a)(3)) for alleged conduct involving his biological daughter, K.W. The allegations with respect to K.W. involved conduct that occurred between January 1, 2004, and January 30, 2005. In Henry County case No. 16-CF-412, defendant was charged with five counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2006)), five counts of criminal sexual assault (*id.* § 5/12-13(a)(3)), and two counts of aggravated criminal sexual abuse (*id.* § 12-16(b)) for conduct involving his stepdaughter, H.S., that occurred between January 1, 2007, and December 31, 2007.

¶ 6          The State filed a motion to admit evidence of other sex crimes pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2016)). The State argued, in addition to the testimony of the two victims in these cases, it intended to present the testimony of two additional minors who accused defendant of alleged inappropriate conduct, as well as certain recorded jail telephone calls, to show defendant's absence of mistake and his propensity to commit sex offenses. The trial court granted the State's motion to admit this evidence.

¶ 7          Thereafter, the State filed a motion for joinder pursuant to section 111-4 of the Code (725 ILCS 5/111-4 (West 2016)). Because the trial court previously granted the State's motion to allow other crimes evidence, the State argued the same evidence would be presented in both cases; therefore, joining the cases for trial promoted judicial economy. At a hearing on the

motion, defense counsel expressed agreement with the State's position, and the court granted the motion to join the two cases.

¶ 8        Prior to trial, the State indicated it would proceed to trial on the following charges: (1) two counts of predatory criminal sexual assault of a child and two counts of criminal sexual assault involving K.W. and (2) one count of predatory criminal sexual assault of a child and one count of criminal sexual assault involving H.S. The remaining counts were dismissed.

¶ 9                                B. The Trial

¶ 10                              1. *The State's Evidence*

¶ 11                              a. Testimony of K.W.

¶ 12        K.W. (born in January 1992) testified she was 25 years old and defendant was her father. Her parents divorced when she was young. K.W. stated she primarily lived with her mother, but she would also live with defendant for extended periods of time. K.W. has a younger sister, A.R., and four younger half-sisters (defendant's daughters with other women). K.W. referred to O.W., her youngest half-sister who was six or seven years old, as her "baby" and described O.W.'s mother, Patti A., as a "second mom."

¶ 13        K.W. described defendant as her "best friend" throughout her life and said they had always been close. K.W. stated they remained close and she held no animosity toward him. She testified, from sixth grade through her senior year in high school, she lived with defendant for extended periods of time, often at least half the school year. K.W. stated she did not believe there was a court-ordered visitation schedule, but when she lived with one parent, she would usually go visit the other on the weekends.

¶ 14        K.W. testified she had a conversation with Patti in June 2016 because she became worried about O.W. After spending a day fishing with O.W., K.W. stated she "just felt

- 3 -

something, that [she] needed to say something" because she was concerned defendant "might try to do what he did to [her] and touch [O.W.]" At that time, K.W. told Patti what defendant had done to her. K.W. was contacted by a detective based on what she told Patti and agreed to give a statement.

¶ 15        K.W. described what happened with defendant. She stated the first incident that made her uncomfortable occurred when she was in sixth grade (11 or 12 years old). Defendant was driving K.W. to her mother's house, and defendant started a "sex talk." He described oral sex, and she "felt weird." While still in sixth grade, K.W. recalled defendant would give her "back rubs and stuff," and "it got weird."  He would have her take off her shirt and would "rub [her] front too." K.W. stated, at that time, defendant had recently broken up with a girlfriend. He was "heartbroken" and "acted really upset." At this time, defendant started having her and A.R. sleep with him in his bed. K.W. stated they were very close and this did not seem odd to her, but at some point, the back rubs made her feel very uncomfortable. The back rubs started with him just rubbing her back, but they progressed over time to him asking her to take off her shirt and lie down on her stomach for a back rub. Then he would ask her to lie on her back so he could rub her on the front. K.W. stated things changed one night when they were all lying in bed going to sleep. Defendant took her hand and moved it over his stomach and to the top of his penis, which was outside of his shorts. K.W. said defendant then touched her vagina with his hand. She pretended to be asleep. Defendant took off her shorts and pulled down his shorts, got on top of her, and had sexual intercourse with her. K.W. stated this had never happened before; she did not know what, if anything, she was thinking when it happened; and she did not remember if she was in pain. When it was over, she said she went to the bathroom and then returned to bed. Defendant did not speak while he abused her, and they did not speak about it afterwards. K.W. remembered

- 4 -

being in her sixth-grade classroom and "replaying it" in her head.

¶ 16      K.W. testified she and defendant spoke about his conduct about a month later. She explained, "[H]e said it was kind of his way of, like, teaching me and his way of showing love." When asked if she responded to him, K.W. stated, "I was pretty passive with my dad. I don't think that I ever really doubted anything he said." K.W. explained she was not really scared of defendant, but she just "believed everything he said at that time." She stated defendant had sex with her "almost nightly" throughout the time she lived or visited with defendant from sixth grade through high school. Oftentimes, A.R. was sleeping next to them. K.W. stated, when she was 17 years old and a senior in high school, "I remember one time that he had asked, you know, to go upstairs, and when I was on my way to the library, I texted him that I didn't want to do that anymore, and it just stopped." She explained defendant would text her to ask her to come upstairs and she knew that meant to have sex.

¶ 17      Although K.W. did not recall when, she did tell A.R. what was happening to her. A.R. "didn't really say much *** in response, but she had said something happened to her, but she didn't really say." K.W. stated, "Even now she doesn't want to talk about it." K.W. said she never told anyone else because she was "very uncomfortable" and "never wanted anything to happen to [defendant]." She asserted she still felt the same way but stated, "[T]hen I wasn't able to protect anyone, so now I feel like I need to." She explained that no one taught her about having her period or keeping track of it, and there was more than one time when she was worried she might be pregnant. K.W. told defendant about her pregnancy concerns because he was the only person with whom she had sex, and he "just blew it off." Defendant never used contraception and would avoid ejaculating inside her. K.W. recalled one of the times she was concerned she might be pregnant was in seventh grade. She recalled "punching" her stomach

- 5 -

because, in her head, she thought "that would somehow make [her] not pregnant." K.W. testified defendant made her engage in oral sex with him and performed oral sex on her. She said defendant had sex with her "pretty much every time the opportunity came" and said it was hundreds of times.

¶ 18 On cross-examination, K.W. clarified when Patti moved in with defendant, she brought her two daughters from a prior relationship, H.S. and C.M., and she eventually married defendant and had their daughter, O.W. K.W. did not feel the need to come forward to protect H.S. and C.M. because she thought "if it was all happening to [her], then it wasn't going to happen to them, so just if [she] took it, then nobody else would get hurt." K.W. stated she "kind of dropped out of school" the second semester of her junior year and was "on a fast track to nowhere." K.W. stated her mother required her and A.R. to begin using birth control when she was a sophomore, explaining her mother "kinda just assumed that we were being sluts and told us to go get on birth control." She acknowledged in 2009, A.R. reported K.W. had been abused by defendant and that resulted in the police and the Illinois Department of Children and Family Services (DCFS) becoming involved. K.W. was interviewed at the child advocacy center, and she denied defendant had abused her. K.W. stated she denied the incidents because "it wasn't [A.R.]'s story to tell," "she didn't do it for reasons that I feel like I need to do it now," and she felt she "needed to protect [defendant] somehow at the time." K.W. stated A.R. told "out of anger" because she was being forced to live with defendant and she did not want to, so she told "my secret that I trusted with her, so I was pretty angry with her."

¶ 19 K.W. testified she lived on her own and was not required to see defendant, but she chose to do so. She explained defendant had two sides; the side that sexually abused her was "one side of my dad, and then the other side was not, like, a monster" but was how a father was

supposed to be. K.W. stated there was some difficulty with her relationship with defendant when she, at 17 years old, informed him she was gay. Their relationship eventually healed. K.W. met her wife four years ago, they had been married for three years, and she had three stepchildren (a 16 year-old daughter, a 14-year-old son, and an 11-year-old son). Defendant was welcome in her home, but he had never visited. She had no concerns about defendant harming her stepdaughter because he had never been around her.

¶ 20 K.W. stated she never told anyone the details about defendant's conduct until she spoke with the detective and gave her statement in June 2016. When she was younger, K.W. did not think anyone else was in danger and really thought she was the only victim. K.W. stated she had forgiven defendant. Defendant never forced her to do anything, explaining they were so close, and "he was, like, 'You're going to protect me, right?' And I'd say, 'Yeah, of course.' "

¶ 21 b. Testimony of H.S.

¶ 22 H.S. (born August 1996) testified she was 21 years old and defendant was her former stepfather. Defendant and her mother, Patti, were married when she was in fifth grade and divorced when she was a sophomore in high school (15 or 16 years old). In June 2016, H.S. told her mother about the incidents that led to the charges in this case. Patti called H.S. while she was at work and asked her if she had ever been touched inappropriately by defendant. H.S. responded that she had. H.S. stated Patti "was in tears," the phone call ended, and she went home to continue the conversation. H.S. explained the time frame but not the details of defendant's conduct, and they called the police. H.S. stated she admitted she had been abused by defendant because she was concerned for her younger sisters. She explained she did not intend to tell her mother, but when asked, she "figured it had been long enough" and she told her mother what defendant had done to her when she was in middle school.

¶ 23          H.S. explained when she was in seventh grade, her mother worked two jobs, a daytime job at a bank and an evening job as a bartender. In the evenings, H.S. and her sister, C.M., would be home with defendant. H.S. remembered the conduct started with normal back rubs, though she explained she "got a little put off" when he started using lotion. H.S. stated the conduct turned into "more than just a back rub." H.S. stated defendant made her touch his penis and she would try to pull her hand away, but he would keep her hand there to force her to help him masturbate. Defendant would take his shirt off and would pull his shorts down to expose himself. This occurred multiple times in her bedroom. Her sister was usually sleeping when this occurred. H.S. testified defendant then started touching her vagina and she told him to stop and that he was hurting her, but he would not stop.

¶ 24          H.S. testified she remembered speaking to a DCFS investigator in 2009. She did not tell the investigator about defendant's abuse because she "had been convinced" by defendant that if she told, she would break up the family, get defendant in "big trouble," and make her mother unhappy and lonely.

¶ 25          On cross-examination, H.S. testified defendant's abuse of her stopped sometime after the DCFS investigation, but she did not recall when. She stated she did not recall any incidents occurring when she was in high school. H.S. did not tell her mother about defendant's conduct even after they divorced during her sophomore year of school because she did not want to see her younger sister, O.W., grow up without a father like she did. She also stated she was not concerned about defendant abusing O.W. because O.W. was so young and she thought it only happened to her because she was defendant's stepdaughter. She stated she always "kept an eye on [C.M.] to make sure that nothing would happen to her." H.S. stated she had never spoken to K.W. about defendant's abuse, learned that K.W. was abused by defendant when her mother

called her that day to ask her if she had been abused, and did not know the specifics of what occurred with K.W.

¶ 26                                    c. Testimony of Johanna Hager

¶ 27          Johanna Hager, a forensic interviewer with Braveheart Children's Advocacy Center, testified as an expert witness in forensic interviewing and clinical psychology. Hager stated she did not interview the victims in this case, noting it would be an exceptional circumstance for Braveheart Children's Advocacy Center to conduct an interview of an adult who experienced abuse as a child.

¶ 28          Hager testified it is very common for children who experience sexual abuse to delay disclosure. When asked why a victim might make a sudden disclosure later in life, she stated if a person takes several years to disclose abuse, it is usually "because some external event has occurred or some other concern in that person's life has occurred to make them want to say something." This could include concern for a younger sibling. She stated children are "much more likely to disclose right away when it's not a family member" and "[t]hey are much more likely to keep it to themselves forever or for years if it is a family member because of their feelings for [the abuser]." She explained most children do not stop loving a family member because they are being sexually abused—they just want the abuse to stop. She also explained it is very common, when a child has previously denied the abuse, to later disclose that it did, in fact, occur. Hager referred to "tentative disclosure" as disclosure that occurs when another person knows information that the victim has not told anyone, has learned of other victims of the same abuser, knows of the abuse because someone witnessed it, such as when someone "walks in on the child being abused," or there are other reasons the victim now wants people to know. Hager stated, if a child is "not ready [to disclose] yet, if their ego strength isn't allowing them to share

what happened, if they just don't even want to admit to themselves what happened yet, they're not going to tell." She explained victims will do whatever they can to move on and "make everything seem as normal as possible" for their family and friends and for themselves.

¶ 29                                    2. *The Rest of the Trial*

¶ 30            After the State rested, defense counsel moved for a directed verdict, which was denied.

¶ 31            The trial court inquired as to defendant's decision to testify. Defense counsel stated he had spoken with defendant about his right to testify and he "would like to remain silent and the defense is going to present no evidence here today." The court admonished defendant he had a right to testify if he chose to do so, no one could force him to testify, he could voluntarily decide not to testify, and it was his decision alone. The court asked defendant again if it was his choice to not testify, and defendant replied, "Yes."

¶ 32            After closing arguments, the jury was instructed and began deliberations. Defendant was found guilty of all six charges, three counts of predatory criminal sexual assault of a child and three counts of criminal sexual assault. Defendant's motion for a new trial was denied, and he was sentenced to mandatory life sentences on the predatory criminal sexual assault of a child convictions and five years' imprisonment on each of the criminal sexual assault convictions.

¶ 33                                    3. *Direct Appeal*

¶ 34            On direct appeal, the Third District determined plain error occurred during the State's closing argument "when it misstated the law regarding hearsay and then compounded that with the implication that was the reason witnesses were not called." *People v. Williams*, 2020 IL App (3d) 170848, ¶ 20. The Illinois Supreme Court reversed and reinstated defendant's original

convictions and sentence. *People v. Williams*, 2022 IL 126918, ¶ 67.

¶ 35                                    4. *Postconviction Proceedings*

¶ 36          In April 2023, defendant, represented by retained counsel, filed a petition for postconviction relief, arguing he was (1) actually innocent and (2) denied effective assistance of counsel because he was denied his right to testify to prove his innocence. In support, defendant attached his affidavit, stating the following: (1) he was innocent of all the charges, (2) he had one conversation with his attorney about his right to testify and informed his attorney he wished to testify in his own defense, (3) his attorney never told him it was his decision whether to testify, (4) his attorney did not prepare him or talk to him about testifying, (5) he relied upon his attorney to support his claim of innocence(6) his attorney "put on no defense at all," and (7) if called to testify, he would have proclaimed his innocence and "demonstrated how the accusations were the fabrication of an ex-wife, the mother of one of the alleged complainants." Defendant also included the notarized statement of his biological daughter, S.W., stating in 2021, she "hear[d] the conversation" between A.R. and her mother about "these false allegations against [defendant.]" S.W. attested A.R.'s mother told A.R. she needed to "leave all of this behind her because Patti, who is [S.W.'s] fathers [*sic*] ex wife, has tried to get everyone to lie on behalf of the accusations against [defendant]." She attested C.R. told her in 2022 that K.W. and Patti reached out to C.R. to ask her to "lie about things that had never even happened between her and [defendant]." She stated there were "many occasions" where she had heard A.R. and Patti say defendant never sexually assaulted any of the victims. The petition was advanced to the second stage because the trial court found it presented the gist of a constitutional claim.

¶ 37          The State filed a motion to dismiss defendant's postconviction petition, arguing defendant's claim that he was denied the right to testify was affirmatively rebutted by the record

and defendant's claim of actual innocence was not supported by evidence, noting S.W.'s signed statement failed to meet the requirements of an affidavit. Although the statement was signed and notarized, it was not a sworn statement and contained multiple levels of hearsay.

¶ 38　　　　In response, at the hearing, defense counsel acknowledged the fact that the trial court admonished defendant of his right to testify but argued the issue raised in the petition was about a conversation defendant had with his attorney about testifying. Defendant stated in his affidavit he wanted to testify and his attorney did not prepare him to do so or put on any defense. Regarding S.W.'s signed statement, defense counsel argued the statute allows the presentation of other evidence, not solely affidavits, to show a constitutional deprivation. The court inquired about the hearsay statements of A.R. in S.W.'s signed statement. Defense counsel explained although A.R. was not a witness who testified at the trial, she was mentioned by K.W. and hearsay is admissible at this stage of the postconviction proceedings.

¶ 39　　　　After hearing arguments, the trial court dismissed defendant's postconviction petition. The court concluded defendant's claim he was denied the right to testify was affirmatively rebutted by the record. The court further found defendant's claim of actual innocence was not supported by any evidence favorable to him, noting the statement of S.W. as to what she had overheard others say, without affidavits from the other individuals, was not sufficient.

¶ 40　　　　This appeal followed.

¶ 41　　　　　　　　　　　　II. ANALYSIS

¶ 42　　　　On appeal, defendant contends (1) the trial court "ignored the standard applicable to a second-stage hearing" (emphasis omitted) by finding the hearsay statements in a written witness statement submitted in support of the petition were insufficient to support a claim of

actual innocence and (2) his postconviction petition should have been granted because he established he was denied his right to testify at trial.

¶ 43 Under the Act, a defendant may "challenge his conviction or sentence for violations of federal or state constitutional rights." *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). A defendant is entitled to postconviction relief if he can "show that he has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged." *Id.* The Act requires the petition to "have attached thereto affidavits, records, or other evidence supporting its allegations" or "state why the same are not attached." 725 ILCS 5/122-2 (West 2022).

¶ 44 There are three stages of postconviction proceedings under the Act. At the first stage, the trial court reviews the petition independently and determines whether it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2022). If the court does not summarily dismiss the petition, the matter proceeds to a second stage, at which "the defendant bears the burden of making a substantial showing of a constitutional violation." *Pendleton*, 223 Ill. 2d at 473. The State must answer or move to dismiss the petition within 30 days of advancing to the second stage or within such further time as the court may set. 725 ILCS 5/122-5 (West 2022). If the petition is not dismissed, the proceeding advances to the third stage, where the defendant may present evidence in support of the petition. 725 ILCS 5/122-6 (West 2022).

¶ 45 This case involves the dismissal of defendant's petition at the second stage of the proceedings. Dismissal of a postconviction petition "is warranted only when the petition's allegations of fact—liberally construed in favor of the petitioner and in light of the original trial record—fail to make a substantial showing of imprisonment in violation of the state or federal constitution." *People v. Coleman*, 183 Ill. 2d 366, 382 (1998). "Nonfactual and nonspecific

- 13 -

assertions which merely amount to conclusions are not sufficient to require a hearing under the Act." *Id.* at 381. "Since there are no factual issues at the dismissal stage of the proceedings, the question is essentially a legal one, which required the reviewing court to make its own independent assessment of the allegations of the petition and supporting documentation." *People v. Sanders*, 2016 IL 118123, ¶ 31. As such, our review is *de novo*. *Id.*

¶ 46                              A. Actual Innocence Claim

¶ 47        Defendant's argument regarding his claim of actual innocence is twofold. He contends the trial court (1) "ignored" (emphasis omitted) the legal standard by requiring his supporting evidence to be in the form of affidavits, and thus, finding his supporting documentation insufficient and (2) improperly found his supporting documentation insufficient because it was hearsay.

¶ 48        As defendant points out, our supreme court has held the Act does not limit a defendant solely to the use of affidavits to support a postconviction petition. *People v. Dupree*, 2018 IL 122307, ¶ 32. Rather section 122-2 of the Act provides a defendant may do so by attaching "affidavits, records, or other evidence" supporting the petition. 725 ILCS 5/122-2 (West 2022). A review of the record reveals the trial court did not dismiss defendant's petition because S.W.'s statement was not in the form of an affidavit; rather, the court dismissed the petition with regard to the actual innocence claim because it was "not supported by any evidence favorable to the Defendant" and the written statement of S.W. was insufficient, standing alone, without affidavits from other witnesses. The court did not disregard S.W.'s statement because it was not sworn; rather, the court considered *all* the supporting evidence presented by defendant, including S.W.'s unsworn statement, and found it insufficient to support his claim.

¶ 49        "[T]o advance to the third stage of postconviction proceedings based upon a claim

of actual innocence, a petitioner must show that the evidence is newly discovered, material and

not merely cumulative, and of such conclusive character that it would probably change the result

on retrial." *People v. Sanders*, 2016 IL 118123, ¶ 46. Newly discovered evidence is evidence

discovered after trial and that a defendant could not have discovered earlier through the exercise

of due diligence. *People v. Robinson*, 2020 IL 123849, ¶ 47. Evidence is material if it is relevant

and probative of a defendant's innocence, and it is noncumulative if it adds to the information

presented at trial. *Id.* The most important element of an actual innocence claim is the conclusive

character element, which "refers to evidence that, when considered along with the trial evidence,

would probably lead to a different result." *Id.*

¶ 50        Illinois Rule of Evidence 1101(b)(3) (eff. Sept. 17, 2019) specifically provides

evidentiary rules do not apply to postconviction proceedings. In second-stage proceedings,

hearsay is treated as follows:

> "[T]he well-pleaded facts in the petition and accompanying affidavits, including
>
> any affidavits containing hearsay, which do not conflict with the record, are taken
>
> as true when determining whether a defendant has made a substantial showing of
>
> his innocence so as to advance the petition to a third-stage evidentiary hearing; no
>
> credibility determinations are made." *People v. Velasco*, 2018 IL App (1st)
>
> 161683, ¶ 117.

See *Robinson*, 2020 IL 123849, ¶ 78 (citing *Velasco* with approval).

¶ 51        In this case, we conclude defendant failed to make a substantial showing of actual

innocence to warrant advancing his claim to a third-stage evidentiary hearing. The hearsay

statements set forth in S.W.'s unsworn statement are not of such conclusive character that they

would probably change the result on retrial. In her statement, S.W. indicated she heard her mother tell A.R. "she needed to leave all of this behind her." Notably, A.R. was not a witness in this case during the trial, and the unclear reference to leaving "this" behind has no specific factual basis to provide a context for how this assertion supports defendant's innocence. S.W. also stated (1) she heard her mother claim Patti "tried to get everyone to lie" about the accusations against defendant and (2) A.R. told her another sister said K.W. and Patti wanted her to "lie about things that had never even happened between her and [defendant]." Neither of these statements, even taken as true, contain specific facts to establish a substantial showing that defendant did not commit the crimes of which he was convicted. Both statements refer to the conduct of other individuals and not defendant. Likewise, S.W.'s statement that there were "many occasions" when she heard A.R. and her mother state defendant had not abused "any of the victims" lacks both the specificity and the conclusive character required to support his claim of actual innocence. Likewise, defendant's conclusory statement in his own affidavit that his testimony would demonstrate how accusations against him were fabricated cannot be considered newly discovered evidence. Furthermore, the statement lacks the specificity and conclusive character, when considered along with the trial evidence, to likely lead to a different result upon a retrial of the case.

¶ 52        In contrast, the evidence presented at trial was substantial and specific. The testimony of K.W. and H.S. described repeated acts of sexual abuse by defendant over extended periods of time and demonstrated consistency in defendant's method of grooming his victims beginning around the age of 12. K.W.'s decision to come forward years after the abuse was prompted by specific concerns about the possibility of defendant abusing her young sister, O.W. In turn, H.S. admitted she was a victim of defendant's abuse when she was asked by her mother

out of concern for her little sisters and learned she was not defendant's only victim. Hager's testimony regarding delayed disclosure and tentative disclosure supported the conduct of the victims in this case. After our review of the allegations in the petition, liberally construed in favor of defendant and considering the original trial record, we conclude defendant failed to make a substantial showing of his claim of actual innocence.

¶ 53                                    B. Right to Testify

¶ 54        Defendant claims his postconviction petition should not have been dismissed because he established he was denied his right to testify at trial. In support, he contends his attorney's off-the-record legal advice caused him to decline to testify and if he had been called, he would have been able to prove his innocence.

¶ 55        To prevail on a postconviction petition alleging ineffective assistance of counsel, a defendant must demonstrate (1) his counsel's performance fell below an objective standard of reasonableness and (2) that deficient performance resulted in prejudice. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish prejudice, a defendant must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

¶ 56        Every defendant has the fundamental constitutional right to decide whether to testify at trial. *People v. Knapp*, 2020 IL 124992, ¶ 46. Although counsel may advise a defendant on the potential consequences of testifying, the ultimate decision whether to exercise that right belongs solely to the defendant. *Id.* Counsel's performance will generally not be found ineffective simply because he or she advised the defendant not to testify. Rather, counsel will

only be found to be ineffective where the "evidence suggests that counsel refused to allow the defendant to testify." *People v. Youngblood*, 389 Ill. App. 3d 209, 217 (2009).

¶ 57     Although defendant contends in his brief that "off-the-record statements made by counsel" persuaded him to tell the trial court he did not wish to testify, defendant's affidavit is silent as to any such statements. Defendant did not attest to any facts suggesting his counsel refused to allow him to testify or persuaded him to waive this right. Rather, defendant attested (1) he told his attorney he wanted to testify, (2) he had one conversation about his desire to testify, (3) his attorney never told him it was his decision whether to testify, and (4) his attorney never prepared him or talked to him about testifying. However, the record reveals defendant was, in fact, properly admonished of his right to testify. At trial, the following colloquy took place:

"THE COURT: Now, I have to make a record while the jury is still out. Let me turn to the defense and inquire as to your decision regarding [defendant's] testimony.

[DEFENSE COUNSEL]: Your Honor, I have spoken to my client about his right to testify and his right to remain silent. He is going to—he would like to remain silent and the defense is going to present no evidence here today.

THE COURT: Okay. [Defendant], I know [defense counsel] has gone over this at length with you about your right to testify if you chose to do so. No one could force you to testify against your will and you can voluntarily decide that you are not going to testify. But the caselaw and the Supreme Court Rules say or they point out and make it a fact that that is your decision and yours alone. Of course you have the input and the advice of counsel, but ultimately the decision is yours. Do you understand that?

- 18 -

THE DEFENDANT: Yes, sir.

THE COURT: Is it your considered choice today to not testify?

THE DEFENDANT: I'm sorry?

THE COURT: Is it your considered choice today not to testify?

THE DEFENDANT: Yes.

THE COURT: Okay. Very well."

¶ 58 We conclude defendant failed to make a substantial showing in his second-stage petition he was denied the right to testify based upon his trial counsel's performance. Because his postconviction allegations were positively rebutted by the record and are, therefore, without merit, we affirm the dismissal of his petition.

¶ 59 III. CONCLUSION

¶ 60 For the reasons stated, we affirm the trial court's judgment.

¶ 61 Affirmed.